IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-1229

Filed: 19 September 2017

Wake County, No. 14 CVS 14791

NORTH CAROLINA STATE BOARD OF EDUCATION, Plaintiff,

v.

THE STATE OF NORTH CAROLINA and THE NORTH CAROLINA RULES REVIEW COMMISSION, Defendants.

Appeal by Defendants from order entered 2 July 2015 by Judge Paul G. Gessner in Wake County Superior Court. Heard in the Court of Appeals 9 August 2016.

> *Campbell Shatley, PLLC, by Robert F. Orr, and Poyner Spruill LLP, by Andrew H. Erteschik, for Plaintiff-Appellee.*
>
> *Troutman Sanders LLP, by Christopher G. Browning, Jr., for Defendant-Appellant North Carolina Rules Review Commission.*
>
> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Amar Majmundar, and Special Deputy Attorney General Olga Vysotskaya de Brito, for Defendant-Appellant The State of North Carolina.*

INMAN, Judge.

This appeal presents a question of first impression: Does the North Carolina Rules Review Commission, an agency created by the General Assembly, have the authority to review and approve rules made by the North Carolina State Board of

Education, whose authority is derived from the North Carolina Constitution? For the reasons explained in this opinion, we conclude the answer is yes.

The North Carolina Rules Review Commission (the "Commission") and the State of North Carolina (collectively, "Defendants") appeal from a trial court's order granting summary judgment in favor of the North Carolina State Board of Education (the "Board") and denying Defendants' motion to dismiss. Defendants argue the trial court erred because the state constitution provides that the Board's power is "subject to laws enacted by the General Assembly," and the General Assembly created the Commission and delegated its review power to the Commission by enacting laws. The Board, however, contends that review by the Commission encroaches on its constitutional authority and that the General Assembly's delegation to the Commission of authority to review and "veto" Board rules violates the separation of powers provision in the North Carolina Constitution.

We hold that rules made by the Board are subject to statutes enacted by the General Assembly requiring review and approval by the Commission. We also hold that the General Assembly has not violated the separation of powers requirement by enacting an administrative procedure for state agencies and delegating to the Commission the power to review and approve—or disapprove—rules made by the Board. Accordingly, we reverse the trial court's order and remand to the trial court for entry of judgment in favor of Defendants.

**Procedural and Appellate History**

On 7 November 2014, the Board commenced this action against Defendants based upon the North Carolina Constitution. The Board's complaint sought a declaratory judgment preventing the Commission from exercising any authority over the Board and, specifically, controlling the Board's enactment of rules. The complaint alleged two as-applied challenges to the Commission's interpretation and application of N.C. Gen. Stat. § 150B-2(1a), the Administrative Procedure Act ("the APA"), one joint as-applied and facial challenge,[1] and four facial challenges to the Commission's enabling legislation.[2]

The complaint did not identify any specific Board rule that had been thwarted by the Commission. The complaint alleged, however, the following:

> Since its inception in 1986, the [Commission] or its staff
> has objected to or modified every rule adopted by the Board
> and submitted to the [Commission] for approval.
> Moreover, the Board has declined to adopt a number of
> rules that it otherwise would have adopted but for the fact

---

[1] The joint as-applied and facial constitutional challenge, which is not at issue on appeal, alleged that the Commission's determination of whether a rule is within a rulemaking entity's authority is both facially unconstitutional and unconstitutional as applied to the Board because it violates Article I, Section 6 and Article IV, Section 1 of the state constitution.

[2] The facial challenges, which are not at issue on appeal, alleged: (1) the Commission improperly exercises legislative power by striking down agency rules without bicameral passage and presentment of a bill as required by Article I, Section 6 of the state constitution; (2) the General Assembly has not provided the Commission with adequate guiding standards in violation of Article I, Section 6 and Article II, Section I of the state constitution; (3) the Commission encroaches on the executive function of rulemaking in violation of Article I, Section 6 and Article III, Section 1 of the state constitution; and (4) the Board is a coequal of the executive and legislative branches of government and not an agency subject to the APA.

> that the [Commission] would have objected to these rules or struck them down.
>
> In addition, the [Commission] review process typically takes a minimum of six months and often longer. Thus, when the Board adopts rules, they do not have the force and effect of law until at least six months later. In the intervening months or, in some cases, years, statewide education policy is effectively enjoined by the [Commission] review process. In this regard, the [Commission's] exercise of authority over the Board's rulemaking erodes the Board's ability to timely address critical issues facing our State in the area of education.

The complaint asserted that the Board would no longer voluntarily submit its rules to the Commission for approval and would nevertheless deem its rules to have the immediate full force and effect of law. The complaint acknowledged that the Board's position is in direct conflict with the Commission's interpretation and application of the APA and the Commission's enabling legislation.

On 12 January 2015, Defendants moved to dismiss the Board's complaint. The Board voluntarily dismissed without prejudice five of its seven claims, leaving only two as-applied challenges. The Board moved for affirmative summary judgment and the case was assigned to a single superior court judge. In a brief supporting their motion to dismiss and opposing the Board's motion for summary judgment, Defendants also argued that they were entitled to summary judgment in their favor.

On 29 June 2015, the trial court heard Defendants' motion to dismiss the Board's remaining two claims and the Board's motion for summary judgment on those

claims. The first of these claims specifically asserts that the Commission's interpretation and application of N.C. Gen. Stat. § 150B-2(1a) to the Board violates Article IX, Section 5 of the North Carolina Constitution, the constitutional provision that grants the Board rulemaking authority. The second claim asserts that the Commission's interpretation and application of N.C. Gen. Stat. § 150B-2(1a) to the Board also violates Article I, Section 6, which requires the separation of powers, and Article II, Section 1, under which the General Assembly "may delegate a limited portion of its legislative power . . . ." *N.C. Tpk. Auth. v. Pine Island, Inc.*, 265 N.C. 109, 114, 143 S.E.2d 319, 323 (1965).

On 2 July 2015, the trial court entered an order allowing the Board's motion for summary judgment,[3] concluding:

> Upon consideration of the plain language of the North Carolina Constitution, and the verified complaint, there is no genuine issue of material fact and Plaintiff is entitled to judgment as a matter of law pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.

Defendants timely appealed to this Court.

---

[3] Although the State references the motion to dismiss in a heading of its brief and cites the appropriate standard of review, the State fails to offer any substantive analysis in support of its argument that the trial court erred in denying Defendants' motion to dismiss. We therefore deem that issue abandoned. N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."); *N.C. Farm Bureau Mut. Ins. Co. v. Smith*, 227 N.C. App. 288, 292, 743 S.E.2d 647, 649 (2013) ("[Appellant] fail[s] to cite any controlling authority in support of this contention or otherwise explain why it has merit, and we accordingly deem the issue abandoned.").

The Board moved to dismiss Defendants' appeal pursuant to N.C. Gen. Stat. § 7A-27(a1), which provides that "[a]ppeal lies of right directly to the Supreme Court from any order or judgment of a court, either final or interlocutory, that holds that an act of the General Assembly is facially invalid on the basis that the act violates the North Carolina Constitution or federal law." N.C. Gen. Stat. § 7A-27(a1) (2015). On 2 March 2016, this Court granted the Board's motion.

On 13 July 2016, the North Carolina Supreme Court entered a special order holding that the trial court's order did not facially invalidate an act of the General Assembly and remanded the appeal to this Court "for consideration of [D]efendants' challenges to the validity of the trial court's order on the merits."

We therefore address the trial court's ruling and the parties' arguments on the Board's two remaining claims.

## Analysis

To better guide our determination of the issues raised on appeal, we consider the historical background surrounding the Board, its creation and evolution, the General Assembly's adoption of the APA and creation of the Commission, and the relation of the Board to the Commission.

### I. Historical Context

*A. Creation and Evolution of the Board*

Public education in North Carolina predates the Board. Our state's first constitution (the "1776 Constitution") provided that "a school or schools shall be established by the Legislature, for the convenient instruction of youth, with such salaries to the masters, paid by the public . . . ." N.C. Const. of 1776, art. XLI.

In 1825, the General Assembly enacted a statute to "create a fund for the establishment of Common Schools." Act of Nov. 21, 1825, ch.1, 1825 N.C. Sess. Laws 3-4. The statute established "a body corporate and politic, under the name of the President and Directors of the Literary Fund[,]" to administer and invest money controlled by the Fund. Act of Nov. 21, 1825, ch.1, 1825 N.C. Sess. Laws 3-4. The statute named the Governor as President of the Literary Fund's board—the first governing body for public education in North Carolina. Act of Nov. 21, 1825, ch.1, 1825 N.C. Sess. Laws 3-4.

The General Assembly allocated to the Literary Fund money from various revenue sources as well as all unoccupied swamp land in North Carolina, and vested the Literary Fund's board with the power to sell, invest, and otherwise exploit assets in the fund to generate revenue for public education and to build schools across the state. Act of Nov. 21, 1825, ch.1, 1825 N.C. Sess. Laws 3-4; Act of Feb. 10, 1855, ch. 27, 1854-55 N.C. Sess. Laws 50-62; *see also Bd. of Educ. Of Duplin Cnty. v. State Bd. of Educ.*, 114 N.C. 313, 317-19, 19 S.E. 277, 277-78 (1894).[4] The Literary Fund was

---

[4] This decision was reprinted in 1921 as 114 N.C. 202.

all but depleted as a result of the Civil War. *See* Jonathan Worth, *Report of the President & Directors of the Literary Fund of North Carolina*, Exec. Doc. 18, General Assembly Session 1866-67 (1867).[5]

Following the Civil War, North Carolina adopted a new state constitution (the "1868 Constitution") which for the first time provided in its Declaration of Rights "a right to the privilege of education." N.C. Const. of 1868, art. I, § 27.[6] Unlike other declarations of rights, this provision did not restrict state government, but rather committed it to an affirmative duty. Orth, *supra*, at 52.

The 1868 Constitution also devoted a separate Article to education, beginning with the premise that "[r]eligion, morality and knowledge being necessary to good government and happiness of mankind, schools and the means of education shall forever be encouraged[,]" and providing for tuition "free of charge to all children of the State between the ages of six and twenty-one years." N.C. Const. of 1868, art. IX, §§ 1-2. It also established the State Board of Education as follows:

> The Board of Education shall succeed to all the powers and trusts of the President and Directors of the Literary Fund of North Carolina, and shall have full power to legislate and make all needful rules and regulations in relation to free public schools and the educational fund of the State; but all acts, rules and regulations of said Board may be

---

[5] The Report was submitted to the General Assembly on 10 December 1866 and printed with other executive and legislative documents maintained during the 1866-67 legislative session.

[6] The 1868 Constitution, unlike the state's 1776 Constitution, was ratified by voters and incorporated individual rights which previously had been provided as constitutional amendments. *See* John V. Orth, *The North Carolina State Constitution*, 13 (1st ed. 1993).

> altered, amended or repealed by the General Assembly,
> and when so altered, amended or repealed they shall not
> be re-enacted by the Board.

N.C. Const. of 1868, art. IX, § 9. The Board was composed entirely of *ex-officio* members, specifically the Governor, Lieutenant Governor, Secretary of State, Treasurer, Auditor, Superintendent of Public Works, Superintendent of Public Instruction, and the Attorney General. N.C. Const. of 1868, art. IX, § 7.

In 1931, the General Assembly established the North Carolina Constitutional Commission, which recommended a constitutional amendment empowering the Board to "supervise and administer the free public school system of the State and make all needful rules and regulations in relation thereto[,]" eliminating the word "legislate" from the Board's powers, and providing that "[a]ll the powers enumerated in this Section shall be exercised in conformity with this Constitution and subject to such laws as may be enacted from time to time by the General Assembly." *The Report of the North Carolina Constitutional Commission*, 33 (1932) (hereinafter the "*1932 Report*"). The Constitutional Commission proposed this amendment as part of an entirely rewritten state constitution. *Id.* at 5. A preamble to the proposed constitution noted that "the chief need is to relax many of the existing restrictions on the powers of the General Assembly, so as to allow more elasticity in shaping government policies, not only in respect to present conditions, but also in regard to future needed adjustments . . . ." *Id.* at 5. The General Assembly proposed the new

constitution in 1933, but because of a technicality, the issue did not come before the voters.[7] John L. Sanders, *Our Constitutions: A Historical Perspective*, *in* North Carolina Manual 73, 77 (Liz Proctor ed., 2011).

In 1938, the Governor's Commission on Education issued a 63-page report recommending that the General Assembly propose to voters the 1932 draft amendment regarding the powers of the Board, and urging that if the amendment was submitted to voters in an election "not entangled with other amendments which might be less worthy, the people of the state will adopt the amendment." *Report and Recommendations of the Governor's Commission on Education,* 31 (Dec. 1, 1938) (hereinafter the "*1938 Report*").[8]

The Commission on Education reviewed the administrative challenge of a system governed by not only the Board but also by four other boards and commissions,

---

[7] The enabling statute provided that the new state constitution could be ratified by voters in the "next general election." Act of May 8, 1933, ch. 383, sec. 2, 1933 N.C. Pub. Laws, 573. An election was held in November 1933 for voters to consider the proposed 21st amendment to the United States Constitution, which would repeal Prohibition as established by the 18th Amendment. Act of May 9, 1933, ch. 403, sec. 1, 1933 N.C. Pub. Laws, 600. The revised state constitution was not on this ballot. *Opinions of the Justices in the Matter of Whether the Election Held on Tuesday After the First Monday in November, 1933, Was the Next General Election Following the Adjournment of the 1933 Session of the General Assembly*, 207 N.C. 879, 181 S.E. 557 (1934). After that election and prior to the next general election in November 1934, the North Carolina Supreme Court held in an advisory opinion that the proposed new state constitution could not be considered by voters because the enabling statute provided for an election date that had already passed. *Id.* at 880, 181 S.E. at 557-58; Sanders, *supra*, at 77; Orth, *supra*, at 20.

[8] The General Assembly in 1937 directed the governor to appoint a commission to examine North Carolina's public education system and to recommend reforms to lawmakers. Act of March 22, 1937, ch. 379, 1937 N.C. Pub. Laws, 709.

and noted that "[t]here seems to be much duplication and some dual control in the workings of these various boards and unnecessary duplication in the work of school administrators." *1938 Report* at 30. The Commission recommended that "all these boards should be consolidated under [the Board] and that the direction of all activities of the teaching profession should come from this central board." *Id.* at 30. To provide the public school system "immediate relief from scattered administration rather than wait for the long time goal of the proposed constitutional amendment," the Commission also proposed that the General Assembly enact legislation to consolidate the work of the various boards and commissions and transfer their duties to the Board. *Id.* at 31.[9]

In 1942, voters adopted a constitutional amendment proposed by the General Assembly making several changes to the governance and power of the Board. Thad Eure, North Carolina Manual, 239-43 (1943). One section of the amendment reduced

---

[9] Despite a provision in the 1868 Constitution for the state to be responsible for providing free public education, efforts by the General Assembly before 1942 to shift primary administrative and funding responsibilities from counties to the state were unsuccessful. *See 1938 Report* at 34. For example, the School Machinery Act implemented a new statewide sales tax to support public schools with money for textbooks, supplies, and teacher salaries. Act of April 3, 1939, ch. 358, 1939 N.C. Pub. Laws, 771-91. Still, counties remained responsible for building schools. *Fletcher v. Comrs. of Buncombe*, 218 N.C. 1, 4, 9 S.E.2d 606, 608 (1940). "To call the resulting condition one of uniformity is to tax optimism. There are one hundred counties in the State, each with its own difficulties and problems, some of which seem to be almost unsolvable. There are one hundred governing boards, composed of men who have widely different ideas upon this subject and with a discretion which may be exercised and reflected in widely divergent standards throughout the State." *Id.* at 7, 9 S.E.2d at 610.

the number of *ex-officio* members and provided for a majority of the Board to be appointed by the Governor. N.C. Const. of 1868 (amended 1942) art. IX, § 8; Act of March 13, 1941, ch. 151, sec. 1-3, 1941 N.C. Pub. Laws, 240-41. Another section of the amendment, central to the matter at hand, revised the Board's authority as follows:

> The State Board of Education shall succeed to all the powers and trusts of the President and Directors of the Literary Fund of North Carolina and the State Board of Education as heretofore constituted. The State Board of Education shall have power to divide the State into a convenient number of school districts; to regulate the grade, salary and qualifications of teachers; to provide for the selection and adoption of the text-books to be used in the public schools; to apportion and equalize the public school funds over the State; and generally to supervise and administer the free public school system of the State and *make all needful rules and regulations in relation thereto. All the powers enumerated in this section shall be exercised in conformity with this Constitution and subject to such laws as may be enacted from time to time by the General Assembly.*

N.C. Const. of 1868 (amended 1942), art. IX, § 9 (emphasis added).

The 1942 amendment eliminated the provision for the Board to have the "full power to legislate." *Id.* It also eliminated the provision that the Board's rules could be "altered, amended or repealed" by the General Assembly and instead provided that "[a]ll the powers enumerated in this section shall be exercised in conformity with this Constitution and subject to such laws as may be enacted from time to time by the General Assembly." *Id.*

In an article advocating that voters adopt the 1942 amendment, one educator explained that because most of the Board's members were elected to fill other offices unrelated to education, the Board "could not possibly do the job of administering a growing public school system." Ralph W. McDonald, Guy B. Phillips, Roy W. Morrison & Edgar W. Knight, *The Constitutional Amendment for a State Board of Education in North Carolina*, 25 The High Sch. J., no. 6, 265, 266 (Oct. 1942). "From time to time, therefore, the Legislature has been forced to set up boards and commissions to carry out duties and responsibilities which, under the Constitution, the State Board of Education was supposed to exercise." *Id.* at 266-67. The other boards and commissions included the State School Commission, the Board of Vocational Education, the Board of Commercial Education, and the State Textbook Commission. *Id.* Even the Literary Fund, which the Board was created to replace after the Civil War, remained vested with education funds and provided loans for school construction and improvements. N.C. Code 1935 (Michie), § 5683.

In 1955, the General Assembly reorganized public education laws and established a statewide uniform system of public schools in a chapter of the General Statutes. Act of May 26, 1955, ch. 1372, sec. 1, 1955 N.C. Sess. Laws 1527. These statutes have been amended over time and are now codified in Chapter 115C of the General Statutes, titled "Elementary and Secondary Education." N.C. Gen. Stat. § 115C-1 (2015).

Our state constitutional provisions for public education have not materially changed since 1942. Following the General Assembly's proposal in 1969 for a complete revision of the 1868 Constitution, Act of July 2, 1969, ch.1258, sec. 1, 1969 N.C. Sess. Laws 1461, and the voters' adoption of the revision in the general election of 1970, the Constitution was amended to its current form. N.C. Const. of 1970;[10] *see also* Sanders, *supra*, at 80-87. The section delineating the Board's powers was renumbered and revised to provide:

> The State Board of Education shall supervise and administer the free public school system and the educational funds provided for its support, except the funds mentioned in Section 7 of this Article, and shall make all needed rules and regulations in relation thereto, subject to laws enacted by the General Assembly.

N.C. Const. of 1970, art. IX, § 5. A report by the North Carolina State Constitution Study Commission stated that Article IX, Section 5 "restates, in much abbreviated form, the duties of the State Board of Education, but without any intention that its authority be reduced." *Report of the State Constitutional Study Commission*, 87 (1968) (hereinafter the "*1968 Report*").

### B. Enactment of the APA and Creation of the Commission

---

[10] The latest version of the North Carolina Constitution is referred to by different authorities as "the 1970 Constitution" or "the 1971 Constitution." *Compare N.C. State Bar v. DuMont*, 304 N.C. 627, 633, 286 S.E.2d 89, 93 (1982), *with* Orth, *supra*, at 20. This opinion will refer to the document as the 1970 Constitution.

In 1973, the General Assembly enacted the APA, initially adopted as Chapter 150A of the General Statutes. The original APA declared that its purpose "shall be to establish as nearly as possible a uniform system of administrative procedure for State agencies." N.C. Gen. Stat. § 150A-1(b) (Cum. Supp. 1977). The APA provides a comprehensive statutory scheme for procedures to allow and require, *inter alia*, notice to the public of proposed rules, public input regarding proposed rules, and due process for individuals affected by administrative rules and decisions.

The APA was rewritten and recodified as Chapter 150B effective 1 January 1986, and its purpose restated to "establish[] a uniform system of administrative rule making and adjudicatory procedures for agencies" and to ensure that rulemaking, advocacy, and adjudication "are not all performed by the same person in the administrative process." N.C. Gen. Stat. §§ 150B-1(a) and 150B-1(b) (Cum. Supp. 1985).

The APA does not explicitly list the Board as a state agency, but it defines "agency" as meaning "an agency or an officer in the executive branch of the government of this State and includes the Council of State, the Governor's Office, a board, a commission, a department, a division, a council, and any other unit of government in the executive branch." N.C. Gen. Stat. 150B-2(1a) (2015). The APA expressly and fully exempts from its application several state agencies listed in N.C. Gen. Stat. § 150B-1(c), exempts from its rulemaking provisions several other state

agencies listed in N.C. Gen. Stat. § 150B-1(d), and exempts from its contested case provisions several other agencies or agency functions. The Board is not listed in any of the exemptions.

At the same time it recodified the APA, the General Assembly added a statute establishing the Rules Review Commission to review all rules promulgated by any state agency subject to the APA. Act of July 16, 1986, ch. 1028, sec. 32, 1985 N.C. Sess. Laws 1028 (originally codified at N.C. Gen. Stat. § 143B-30.1 (Interim Supp. 1986)). The statute as currently codified requires that temporary and permanent rules proposed by an agency be submitted and approved by the Commission before becoming effective. N.C. Gen. Stat. §§ 150B-21.8(b) and 150B-21.9 (2015).

*C. Intersection of the Board's and the Commission's Authority*

In 1981, following the General Assembly's enactment of the APA, the General Assembly added to Article 1 of Chapter 115C, governing the public education system, a statute making all action by all agencies governed by the Chapter subject to all provisions of the APA. Act of May 20, 1981, ch. 423, sec. 1, 1981 N.C. Sess. Laws 510; N.C. Gen. Stat. § 115C-2 (Cum. Supp. 1981); *see* N.C. Gen. Stat. § 115C-2 (2015).

For more than a quarter century, the Board proposed rules to the Commission for review and otherwise participated in the rules review process. However, as evidenced by this dispute, the Board now challenges the Commission's authority to limit the Board's rulemaking authority derived from the North Carolina Constitution.

With this historical context in mind, we turn to the trial court's order and Defendants' appeal.

## II. Standard of Review

We review a trial court's order denying or granting a motion for summary judgment *de novo*. *Rogerson v. Fitzpatrick*, 170 N.C. App. 387, 390, 612 S.E.2d 390, 392 (2005). A trial court's interpretation of the state constitution or a statute is also subject to *de novo* review. *See Hart v. State*, 368 N.C. 122, 130, 774 S.E.2d 281, 287 (2015); *see also Ennis v. Henderson*, 176 N.C. App. 762, 764, 627 S.E.2d 324, 325 (2006). *De novo* review allows this Court to substitute its judgment for that of the trial court. *Blow v. DSM Pharm., Inc.*, 197 N.C. App. 586, 588, 678 S.E.2d 245, 248 (2009).

Even when applying *de novo* review, however, we must abide by the long established presumption that statutes—including all statutes implicated by the Board's challenge to the Commission's authority—are constitutional both facially and as applied to any party. *Baker v. Martin*, 330 N.C. 331, 334, 410 S.E.2d 887, 889 (1991) ("Every presumption favors the validity of a statute. It will not be declared invalid unless its unconstitutionality be determined beyond a reasonable doubt." (internal citations and quotation marks omitted)). "[T]he constitutional violation must be plain and clear." *State ex rel. McCrory v. Berger*, 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016) (citation omitted). Any doubt as to the constitutionality of a

statute must be resolved in favor of the legislature. *Baker*, 330 N.C. at 338, 410 S.E.2d at 891.

Neither the trial court nor this Court possesses the authority to decide whether governmental action required or allowed by a statute fosters good or bad policy. "If constitutional requirements are met, the wisdom of the legislation is a question for the General Assembly." *Hart*, 368 N.C. at 126, 774 S.E.2d at 284 (citation omitted).

**III. Discussion**

*A. The Closest, But Not Controlling, Precedent*

No North Carolina appellate court has previously decided the issue presented in this appeal. The North Carolina Supreme Court came the closest in *State v. Whittle Communications*, 328 N.C. 456, 402 S.E.2d 556 (1991), when it invalidated the Board's temporary rule prohibiting local school boards from contracting with a television content provider for short news segments that included commercial advertising. The Supreme Court held that because the General Assembly had enacted a statute delegating to local school boards the selection of supplemental educational materials, the Board had no authority to enact a rule on the subject. *Id.* at 466, 402 S.E.2d at 562.

The dispute in *Whittle* was prompted when the Commission disapproved of the rule on the ground that it exceeded the Board's statutory authority. *Id.* at 460, 402 S.E.2d at 558. A superior court judge reviewed the matter and held that the Board's

rule was invalidly adopted in violation of the APA. The Board appealed, arguing, *inter alia*, that the APA rulemaking requirements did not apply to rules implementing the state constitution's grant of authority to the Board. *Id.* at 463-64, 402 S.E.2d at 560. The Supreme Court rejected the Board's argument on a narrower ground. *Id.* at 466-67, 402 S.E.2d at 562. It interpreted the statute authorizing local boards to select supplemental materials as leaving such selection "entirely to the discretion of local school boards[,]" and held that the Board's rule necessarily conflicted with the existing statute. *Id.* at 465, 402 S.E.2d at 561. In light of the existing statute, the Supreme Court reasoned, "deciding whether the State Board had the authority, absent legislative action, to enact this rule through direct constitutional authority and deciding whether the APA provisions concerning the adoption of temporary rules apply are not necessary to a resolution of this issue." *Id.* at 466-67, 402 S.E.2d at 562.

Two dissenting justices, both prominent state constitutional scholars, offered no constitutional analysis to protect the Board's rulemaking authority. *Id.* at 471-77, 402 S.E.2d at 565-68 (Martin., J., joined by Exum, C.J., dissenting). The dissenting opinion noted that the statute cited by the majority did not grant the local boards *exclusive* authority to select and procure supplemental materials. *Id.* at 472, 402 S.E.2d at 565. The dissent also interpreted the Board's rule to constrain only the purchase of materials in a format limiting or impairing the authority of local boards

and administrators to determine the content and timing of materials presented to students. *Id.* at 473-74, 402 S.E.2d at 566.

Because this appeal concerns the Commission's authority to review and approve all Board rules, the issue before us exceeds the parameters of *Whittle*.

### B. Constitutional Powers and Limits of the Board

The Commission argues that the trial court erred in entering summary judgment rendering all rules promulgated by the Board exempt from the Commission's rules review and approval process. The Board argues, as it did successfully before the trial court, that Article IX, Section 5 of the North Carolina Constitution endows it with broad rulemaking authority subject only to specific enactments of the General Assembly, and that review by the Commission is not a specific enactment of the General Assembly.

In reviewing this issue, we must consider the relationship between the Board's authority derived from the North Carolina Constitution, the General Assembly's authority to restrict the Board's authority, and the General Assembly's authority to delegate to the Commission the power to review, approve, and disapprove rules proposed by the Board.

Our analysis is guided by "the text of the constitution, the historical context in which the people of North Carolina adopted the applicable constitutional provision, and our precedents." *Berger*, 368 N.C. at 639, 781 S.E.2d at 252 (citation omitted);

*see also Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*, 363 N.C. 500, 505, 681 S.E.2d 278, 282 (2009) ("In interpreting our Constitution, we are bound to 'give effect to the intent of the framers of the organic law and of the people adopting it.'" (quoting *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953))); *DuMont* 304 N.C. at 634, 286 S.E.2d at 93-94 ("Reference may be had to unofficial contemporaneous discussions and expositions in arriving at a correct interpretation of the fundamental law.").

The 1868 Constitution vested in the Board the "full power to legislate and make all needful rules and regulations" for public schools, and provided that "all acts, rules and regulations of said Board may be altered, amended or repealed by the General Assembly . . . ." N.C. Const. of 1868, art. IX, §9. This language appears to limit the General Assembly to acting only once the Board has enacted some rule or regulation. Therefore, under the 1868 Constitution, the General Assembly would not, for example, be able to require the Board to gain legislators' approval of proposed rules before their enactment, because such action does not fall within the language of "alter," "amend," or "repeal." However, this aspect of the 1868 Constitution has not previously been examined by our appellate courts.

The only reported legal dispute about the 1868 constitutional provisions for education concerned how to pay for public schools. The North Carolina Supreme

Court held in *Lane v. Stanly*, 65 N.C. 153, 157 (1871),[11] that "the Constitution establishes the public school system, and the General Assembly provides for it, by its own taxing power, and by the taxing power of the counties, and the State board of education, by the aid of School committees, manage[s] it." *Lane* held that county commissioners, but not town boards, could tax citizens for public schools concurrent with the General Assembly's authority to impose taxes for public education. *Id.* at 156-58. It did not address the parameters of the Board's authority to manage the public school system or the parameters of the General Assembly's authority to enact public education rules.

The 1942 amendment to Article IX, Section 9 divested the Board of legislative authority and made the Board's rulemaking authority subject to the General Assembly's legislative authority. The amendment, as discussed *supra*, eliminated language vesting in the Board the "full power to legislate," replacing it with enumerated specific duties and the authority "generally to supervise and administer the free public school system of the State and make all needful rules and regulations in relation thereto." N.C. Const. of 1868 (amended 1942), art. IX, § 9. The 1942 amendment also eliminated the language restricting the General Assembly's authority over the Board to alter, amend, or repeal the Board's rules and instead provided, more broadly, that the Board's authority was "subject to such laws as may

---

[11] This decision was reprinted in 1964 as 65 N.C. 117.

be enacted from time to time by the General Assembly." N.C. Const. of 1868 (amended 1942), art. IX, § 9. The question before us is whether this change in language, ratified by voters in 1942 and substantially retained in the 1970 Constitution, permits the General Assembly to limit the Board's rulemaking authority by requiring prior approval of the Board's proposed rules by the General Assembly or an executive branch agency other than the Board.

The Board argues that the first sentence of the 1942 amendment to Article IX, Section 9, which defined the governance of the Board, "clarified that the Board retained all the powers it held under the 1868 Constitution"—including the power to legislate all matters related to public education—subject only to being altered, amended, or repealed by the General Assembly. The first sentence of Section 9 provided that "[t]he State Board of Education shall succeed to all the powers and trusts of the President and Directors of the Literary Fund of North Carolina and the State Board of Education as heretofore constituted." N.C. Const. of 1868 (amended 1942), art. IX, § 9. The Board's interpretation conflicts with the amendment's deletion of the Board's power to legislate and its added grant to the General Assembly of broader oversight of the Board.

"[I]n case of ambiguity the whole Constitution is to be examined in order to determine the meaning of any part and the construction is to be such as to give effect

to the entire instrument and not to raise any conflict between its parts which can be avoided." *State v. Baskerville*, 141 N.C. 811, 818, 53 S.E. 742, 744 (1906).[12]

Construing the first sentence of the 1942 amendment to revive and preserve the full scope of authority provided to the Board in the 1868 Constitution, as the Board argues, directly conflicts with the 1942 amendment's limitation on that authority by deleting the provision for "full power to legislate." The Board's argument also conflicts with the amendment's final full sentence providing that the Board's authority is wholly subject to laws enacted by the General Assembly. To interpret an amendment that reallocates powers between the Board and the General Assembly as preserving the Board's previous powers fails the test of common sense.

These competing provisions in the 1942 amendment can be harmonized by interpreting the first sentence to establish that the Board, and none of the other then-existing education boards and commissions created by the General Assembly since 1868, was authorized to regulate public schools. Reciting that the Board succeeded to all the powers of the Literary Fund's board nullified the authority of other boards and commissions to perform duties initially assigned to the Board. This interpretation is also consistent with the amendment's additional provisions listing specific powers vested in the Board which previously had been exercised by the other, "scattered" administrative agencies.

---

[12] This decision was reprinted in 1921 as 141 N.C. 617.

In addition to the basic canon of constitutional construction to interpret separate provisions in harmony, history also favors our interpretation of the 1942 amendment. "A court should look to the history, general spirit of the times, and the prior and the then existing law in respect of the subject matter of the constitutional provision under consideration, to determine the extent and nature of the remedy sought to be provided." *Perry*, 237 N.C. at 444, 75 S.E.2d at 514. As discussed *supra*, at the time the 1942 amendment was ratified, there had been a decade-long push, evidenced by the 1931 Constitutional Commission's preamble to its proposed constitutional rewrite, to "relax many of the existing restrictions on the powers of the General Assembly," as a way "to allow more elasticity in shaping governmental policies . . . in regard to future needed adjustments . . . ." *1932 Report* at 5. The intent of the General Assembly in proposing the 1932 Constitution can be extended to the 1942 amendment because the underlying reasoning for the amendment, as discussed in intervening years, had not changed.

The General Assembly's declared purpose of the APA upon its recodification was to "establish[] a uniform system of administrative rulemaking and adjudicatory procedures for agencies" and to ensure that rulemaking, advocacy, and adjudication "are not all performed by the same person in the administrative process." N.C. Gen. Stat. §§ 150B-1(a) and 150B-1(b) (Cum. Supp. 1985). The need for uniformity in

agency rulemaking procedures is simply one such "future needed adjustment" fostered by the 1942 amendment.

Based on the plain language of the constitutional text, further bolstered by supplemental authorities, we hold that by the 1942 amendment to the North Carolina Constitution, the framers and voters consolidated in the Board all administrative authority governing a statewide public school system, limited the Board's authority to making rules and regulations subject to laws enacted by the General Assembly, eliminated the Board's authority to legislate, and thereby restored to the General Assembly all legislative authority regarding public education.

We are not persuaded by the Board's argument that the 1942 amendment could not divest the Board of authority derived from the 1868 Constitution. The Board has cited no judicial decision, no statute, and no other authority supporting its contention that the framers of the 1868 Constitution intended to preclude a later constitutional amendment modifying the Board's authority and the manner in which the General Assembly ultimately governs the Board. We are aware of no authority that prohibits a state constitution from diminishing the constitutionally derived authority of any agency by constitutional amendment so long as the amendment does not violate the United States Constitution.

" '[U]nder our Constitution, the General Assembly, so far as that instrument is concerned, is possessed of full legislative powers unless restrained by express

constitutional provision or necessary implication therefrom.' " *Martin v. N.C. Hous. Corp.*, 277 N.C. 29, 41, 175 S.E.2d 665, 671 (1970) (alteration in original) (quoting *Thomas v. Sanderlin*, 173 N.C. 329, 332, 91 S.E. 1028, 1029 (1917)). Although the General Assembly was restrained by the 1868 Constitution from making public education laws except by altering, amending, or repealing legislation by the Board, the 1942 amendment expanded the General Assembly's legislative authority, and the prior restrictions no longer apply.

The 1970 Constitution did not in any meaningful way amend the Board's authority to make rules and regulations, as it still provides that the Board "shall make all needed rules and regulations . . . subject to laws enacted by the General Assembly." N.C. Const. of 1970, art. IX, § 5. The North Carolina Supreme Court declared that the intent of the 1970 Constitution was merely to "update, modernize and revise editorially the 1868 Constitution." *DuMont*, 304 N.C. at 636, 286 S.E.2d at 95 (citing the *1968 Report*).[13] Among the extraneous and obsolete provisions deleted in the 1970 Constitution was the first sentence in the 1942 amended section describing the powers and duties of the Board, which provided that the Board "shall

---

[13] Constitutional scholars share the view that the 1970 Constitution primarily addressed editorial, and not substantive, concerns. Orth*, supra*, at 20-21 (describing the 1970 Constitution as "a good-government measure, long matured and carefully crafted by the state's lawyers and politicians, designed to consolidate and conserve the best features of the past, not to break with it."); Sanders*, supra,* at 81-82 (referring to the amendments as "extensive editorial changes" and "substantive changes that the commission judged would not be controversial or fundamental in nature[]").

succeed to all the powers and trusts of the President and Directors of the Literary Fund of North Carolina and the State Board of Education as heretofore constituted." N.C. Const. of 1970, art. IX, § 5. That the deletion of this section in 1970 was viewed as merely editorial confirms our interpretation of the sentence as clarifying that the Board, and not any other administrative agency existing in 1942, would establish rules and regulations for the public schools.

The Board relies on *DuMont*'s holding that "the 1970 framers intended to preserve intact all rights under the 1868 Constitution" for the assertion that the Board maintains its powers under the 1868 Constitution. 304 N.C. at 636, 286 S.E.2d at 95. This argument is misplaced. Unlike the provision for the right to a jury trial, which was unchanged between 1868 and 1970 and was at issue in *DuMont*, our state constitution's provision for the power and duties of the Board was substantively amended in 1942. *DuMont* did not address that pivotal amendment or the 1942 framers' intent. And unlike *DuMont*, this case does not concern the scope of an individual right rooted in the state constitution. The North Carolina Constitution vests individual citizens with the right to free public education. N.C. Const. of 1970, art. I, § 15; *see also Hoke Cty. Bd. of Educ. v. State*, 358 N.C. 605, 616-17, 599 S.E.2d 365, 377-78 (2004) ("*Leandro II*") (holding that the constitutional right to public education is vested in children and not in state entities); *Leandro v. State*, 346 N.C.

336, 345, 488 S.E.2d 249, 254 (1997) ("*Leandro I*"). It does not vest the Board with any rights, but rather with power and responsibilities.

Our interpretation of the 1942 amendment requires that we reject the Board's argument that it is vested with broad authority that cannot be limited except as through alteration, amendment, and repeal by the General Assembly.

The North Carolina Supreme Court considered the Board's rulemaking authority, as amended in 1942, in *Guthrie v. Taylor*, 279 N.C. 703, 185 S.E.2d 193 (1971). In *Guthrie*, the plaintiff, a public school teacher, challenged a Board regulation requiring teachers to complete certain courses to qualify to renew their teaching certificates. *Id.* at 709, 185 S.E.2d at 198. The Supreme Court noted that the last sentence of Article IX, Section 9 "was designed to make, and did make, the powers so conferred upon the State Board of Education subject to limitation and revision by acts of the General Assembly." *Id.* at 710, 185 S.E.2d at 198. But because the General Assembly had not limited the Board's rulemaking powers regarding teacher certification, the Board's regulation was valid. The Supreme Court explained:

> The Constitution, itself, . . . conferred upon the State Board of Education the powers so enumerated, including the powers to regulate the salaries and qualifications of teachers and to make needful rules and regulations in relation to this and other aspects of the administration of the public school system. Thus, *in the silence of the General Assembly*, the authority of the State Board to promulgate and administer regulations concerning the certification of

teachers in the public schools was limited only by other provisions in the Constitution, itself.

*Id.* at 710, 135 S.E.2d at 198-99 (emphasis added).

Here, the General Assembly has not been silent, but rather has exercised its authority to limit the Board's rulemaking powers. The General Assembly, by enacting laws adopting a uniform statutory scheme governing administrative procedure, including the establishment of the Commission to review administrative rules, has imposed the requirement that the Board's rules be reviewed and approved prior to becoming effective. Our holding that the Board's rulemaking authority is subject to statutes providing for review and approval is therefore consistent with the holding in *Guthrie* and falls within the 1942 amendment's delineation of the General Assembly's authority over the Board.

### C. Delegated Powers of the Commission

As discussed *supra*, the General Assembly has delegated to the Commission the procedural process through which the Board's rules are reviewed and approved before becoming effective. The Board contends that statutes making its rules subject to the Commission's review and approval result in an unconstitutional delegation of authority by the General Assembly in violation of Article I, Section 6 (separation of powers provision), Article II, Section 1 (vesting legislative power in the General Assembly), and Article IX, Section 5 (vesting rulemaking power in the Board). We disagree.

Article II, Section 1 of the North Carolina Constitution vests the General Assembly with the broad power to legislate. N.C. Const. of 1970, art. II, § 1. It also permits the General Assembly to delegate "a *limited* portion of its legislative powers," *N.C. Tpk. Auth.*, 265 N.C. at 114, 143 S.E.2d at 323 (emphasis in original), in contrast with its "supreme legislative power," *id.*, to certain agencies "so long as adequate guiding standards are provided." *Adams v. N.C. Dep't of Nat. & Econ. Res.*, 295 N.C. 683, 697, 249 S.E.2d 402, 410 (1978); *see also* N.C. Const. of 1970, art. II, § 1.

As explained by the North Carolina Supreme Court in *Adams*:

> [W]e have repeatedly held that the constitutional inhibition against delegating legislative authority does not preclude the legislature from transferring adjudicative and rule-making powers to administrative bodies provided such transfers are accompanied by adequate guiding standards to govern the exercise of the delegated powers.

295 N.C. at 697, 249 S.E.2d at 410 (internal citations omitted).

The *Adams* Court explained why the General Assembly's delegation of authority is necessary: "A modern legislature must be able to delegate—in proper instances—'a limited portion of its legislative powers' to administrative bodies which are equipped to adapt legislation 'to complex conditions involving numerous details with which the Legislature cannot deal directly.'" *Id.* at 697, 249 S.E.2d at 410 (quoting *N.C. Tpk. Auth.*, 265 N.C. at 114, 143 S.E.2d at 323).

The General Assembly's and the Board's authority specific to education are both derived from the same Article IX, Section 5 of the North Carolina Constitution.

But unlike the Board, the General Assembly possesses power that exceeds the scope of Section 5. Article II, Section 1 of the North Carolina Constitution provides that "[t]he legislative power of the State shall be vested in the General Assembly, which shall consist of a Senate and a House of Representatives." This plenary provision vests in the legislative branch the power to enact all laws not prohibited by the constitution, including the APA and the enabling statute for the Commission. The General Assembly has not delegated to the Commission the overarching authority to enact legislation limiting the Board's rulemaking. Rather, the General Assembly exercised its authority by enacting statutes requiring the Board to obtain approval of proposed rules before they take effect. The General Assembly has merely delegated the implementation of its legislation to the Commission.

The Board argues, and our dissenting colleague agrees, that this Court should adopt the reasoning of the Supreme Court of Appeals of West Virginia, which held that any statutory provision interfering with the rulemaking authority of that state's board of education violated the separation of powers clause in that state's constitution. *West Va. Bd. of Educ. v. Hechler*, 180 W. Va. 451, 455-56, 376 S.E.2d 839, 843 (1988). The West Virginia court in *Hechler* invalidated a statutory amendment making rules promulgated by the board of education, which historically had been exempt from administrative review, subject to review and approval by a new legislative oversight commission on educational accountability. *Id.* at 455-56,

376 S.E.2d at 843. But West Virginia's constitutional provision for its board of education is not the same as ours, nor did it evolve in a manner similar to ours. Also, the Commission's structure differs materially from the review commission in West Virginia, which was composed solely of members of its legislature.[14] For these reasons, we decline to follow *Hechler*.

The dissent also emphasizes that the North Carolina Constitution expressly vests in the Board the power to make "needed rules and regulations" relating to public education and asserts that by subjecting the Board's rules to review and approval by the Commission, the General Assembly has impermissibly transferred to the Commission an express power conferred upon it by our state constitution. But the General Assembly has by statute ensured that the Commission is unable to create and impose rules, and has made clear that the Commission does not have the authority to review the substantive efficacy of rules proposed by the Board. N.C. Gen. Stat. § 150B-21.9 (2015). The Commission's authority to implement the review and approval process is subordinate to the General Assembly's authority to create the

---

[14] If the Commission here were solely composed of legislators, we would be presented with an entirely different issue concerning the separation of powers—namely, the legislature may not delegate powers to itself. *See State ex rel. Wallace v. Bone*, 304 N.C. 591, 608, 286 S.E.2d 79, 88 (1982) (holding that "the legislature cannot constitutionally create a special instrumentality of government to implement specific legislation and then retain some control over the process of implementation by appointing legislators to the governing body of the instrumentality").

review and approval process. Therefore, we are unpersuaded that the Commission's power is in conflict with the Board's broad rulemaking authority.

The "complex conditions" and "numerous details" considered by the Commission with respect to rules proposed by the Board, consistent with our Supreme Court's holding in *Adams,* include the more than 100 local school districts across the state, more than 500 statutes in Chapter 115C of the General Statutes,[15] and hundreds of administrative rules governing our public schools in Title 16 of the Administrative Code on topics ranging from teacher certification to curriculum to school buses. N.C. Admin. Code tit. 16, *et seq*. (April 2016).

The General Assembly is not always in session, and even when in session, legislators and their able staff have inadequate time and human resources to address the many specific needs and issues in the public school system by legislation. The General Assembly's interest in uniformity among administrative agencies is served by making one central agency responsible for reviewing the rulemaking by all of the others. For this reason, delegation of adjudicative authority to the Commission is necessary. "The goals and policies set forth by the legislature for the agency to apply in exercising its powers need be only as specific as the circumstances permit." *Matter of Broad and Gales Creek Cmty. Ass'n,* 300 N.C. 267, 273, 266 S.E.2d 645, 651 (1980)

---

[15] The General Assembly also has provided by statute for the Board's authority by incorporating the provisions of the state constitution and adding dozens of specific powers and duties. N.C. Gen. Stat. § 115C-12 (Interim Supp. 2016).

(internal citations omitted). "It is enough if general policies and standards have been articulated which are sufficient to provide direction to an administrative body possessing the expertise to adapt the legislative goals to varying circumstances." *Adams*, 295 N.C. at 698, 249 S.E.2d at 411.

In assessing whether the guiding standards provided by the General Assembly are adequate, "it is permissible to consider whether the authority vested in the agency is subject to procedural safeguards." *Id.* at 698, 249 S.E.2d at 411. "[T]he existence of adequate procedural safeguards supports the constitutionality of the delegated power and tends to insure that the decision-making by the agency is not arbitrary and unreasoned." *In re Declaratory Ruling by N.C. Comm'r of Ins. Regarding 11 N.C.A.C. 12.0319*, 134 N.C. App. 22, 33, 517 S.E.2d 134, 142 (1999) (internal quotation marks and citation omitted).

The General Assembly has provided the Commission with criteria for reviewing the permanent rules submitted to it by state agencies, including the Board. These criteria include, *inter alia*, specific provisions in hundreds of statutes and administrative code sections previously enacted. The Commission's review is limited to determining whether a proposed rule: (1) is "within the authority delegated to the agency by the General Assembly[;]" (2) is clear and unambiguous; (3) is "reasonably necessary to implement or interpret an enactment of the General Assembly, or of Congress, or a regulation of a federal agency[;]" and (4) was adopted in accordance

with the procedures prescribed by the APA for rulemaking. N.C. Gen. Stat. §§ 150B-21.9(a)(1)-(4).

The Board argues, and our dissenting colleague agrees, that the first of these criteria for review by the Commission, to determine whether a proposed rule is "within the authority delegated to the agency by the General Assembly," cannot apply to the Board because its authority is delegated not merely by the General Assembly, but by the North Carolina Constitution. This point, considered in isolation, is persuasive. But when the plain language of a statute appears to create a constitutional conflict, we must look to other statutes, to our state constitution, and to precedent for guidance. Considering the genesis and evolution of the Board, the APA, and the Commission, and the Supreme Court's reasoning in *Whittle*, which resolved a similar issue in favor of upholding the Commission's authority, we are not persuaded that the Board's authority to make rules in any subject area is beyond the reach of the APA.

The General Assembly has also expressly protected its legislative authority from encroachment by the Commission. N.C. Gen. Stat. § 150B-21.9 provides that "[t]he Commission shall not consider questions relating to the quality or efficacy of the rule but shall restrict its review to determination of the standards set forth in this subsection[,]" which restricts the Commission from providing substantive review of proposed rules.

Additionally, the General Assembly has provided adequate procedural safeguards by subjecting the Commission's decisions regarding whether the Board (or any agency) has properly followed the APA's procedures for promulgating rules to judicial review. *See* N.C. Gen. Stat. § 150B-21.8(d). Indeed, the Board has employed this procedural safeguard to obtain judicial review in the trial and appellate courts. *See Whittle*, 328 N.C. 456, 402 S.E.2d 556.

We hold that the review and approval authority delegated to the Commission is an appropriate delegable power and that the General Assembly has adequately directed the Commission's review of the Board's proposed rules and limited the role of the Commission to evaluating those proposed rules to ensure compliance with the APA.

By providing adequate guidelines for rules review, the General Assembly has ensured that the Commission's authority as it relates to the rules promulgated by the Board is not "arbitrary and unreasoned" and is sufficiently defined to maintain the separation of powers required by our state constitution. *In re Declaratory Ruling*, 134 N.C. App. at 33, 517 S.E.2d at 142. Accordingly, we reject the Board's challenge to the Commission's authority based on constitutional provisions for separations of power.

## Conclusion

For the reasons we have explained, we hold that: (1) the 1942 amendment to Article IX of the North Carolina Constitution rebalanced the division of power between the Board and the General Assembly by limiting the Board's authority to be subject more broadly to enactments by the General Assembly; (2) the General Assembly, by enacting the APA and creating the Commission, acted within the scope of its constitutional authority to limit the Board's rulemaking authority by requiring approval of rules prior to enactment; (3) the General Assembly's delegation to the Commission of the authority to review and approve Board rules does not contravene the Board's general rulemaking authority; and (4) the General Assembly has delegated review and approval authority to the Commission without violating the separation of powers clause by providing adequate guidance and limiting the Commission's review and approval power.

Because the undisputed facts compel these conclusions, and because no other factual allegations can change the constitutional relationship of the Board, the General Assembly, and the Commission, the trial court erred in entering summary judgment in favor of the Board and in denying Defendants' motion for summary judgment. The trial court's order is reversed and this matter is remanded for entry of judgment in favor of Defendants.

REVERSED AND REMANDED.

Chief Judge MCGEE concurs.

Judge TYSON dissents with separate opinion.

No. COA15-1229 – *N.C. State Bd. of Educ. v. The State of N.C.*

TYSON, Judge, dissenting.

I respectfully dissent from the majority's opinion. Defendant has failed to show error in the superior court's ruling that the General Assembly has not constitutionally delegated its authority over rules and regulations adopted by the North Carolina State Board of Education ("State Board") to the Rules Review Commission ("RRC") by enacting the North Carolina Administrative Procedure Act ("NCAPA"). N.C. Gen. Stat. § 150B (2015).

## I. Article IX, Section 5

The plain language of Article IX, Section 5 of the North Carolina Constitution states:

> The State Board of Education *shall supervise and administer* the free public school system and the educational funds provided for its support, except the funds mentioned in Section 7 of this Article, and *shall make all needed rules and regulations in relation thereto, subject to laws enacted by the General Assembly*.

N.C. Const. art. IX, § 5 (emphasis supplied).

Our Supreme Court has established the proper standard of review: "In interpreting our Constitution[,]. . . where the meaning is clear from the words used, we will not search for a meaning elsewhere." *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 479 (1989) (citation omitted). Under the plain language of this article, only "laws enacted by the General Assembly" may take precedent over "needed rules and regulations" promulgated by the constitutionally established State

Board. N.C. Const. art. IX, § 5.

The RRC is not the General Assembly. *See* N.C. Const. art. II, § 1 ("The legislative power of the State shall be vested in the General Assembly, which shall consist of a Senate and a House of Representatives."). Review by and decisions of the RRC are not "laws enacted by the General Assembly." N.C. Const. art. IX, § 5.

The RRC was created by statute in 1986, long subsequent to the ratification of the current version of Article IX, § 5, and consists of ten non-elected members appointed by the General Assembly. N.C. Gen. Stat. § 143B-30.1(a) (2015); 1985 N.C. Sess. Law 1028. The RRC members purported to act on their own accord in delaying and striking down "needed rules and regulations" established under constitutionally mandated policy of the State Board, without bicameral review and presentment of a bill.

The RRC's purpose is to "review[] administrative rules in accordance with Chapter 150B of the General Statutes." N.C. Gen. Stat. § 143B-30.2 (2015). The NCAPA defines "rule" as "*any agency regulation*, standard, or statement of general applicability that implements or interprets an enactment of the General Assembly or Congress or a regulation adopted by a federal agency or that describes the procedure or practice requirements of an agency." N.C. Gen. Stat. § 150B-2(8a) (2015) (emphasis supplied).

The majority's opinion accepts Defendants' usurpation of the plain language of

Article IX and the framers' intent, and holds the various laws which establish the RRC and its review process are "laws enacted by the General Assembly," and that the policies and procedures of the State Board are "subject to" RRC review and authority. *See* N.C. Const. art. IX, § 5.

Under the plain language of Article IX, the People established the State Board and intended its educational policy and rulemaking authority to be limited only by "laws enacted by the General Assembly," which requires bicameral review and presentation of a bill. The People did not intend the constitutional rulemaking authority of the State Board to be "subject to" delays and veto by a commission of non-elected officials, who are statutorily tasked under the NCAPA to review proposed "agency rules." *See* N.C. Gen. Stat. § 143B-30.2; N.C. Gen. Stat. § 150B-2(8a). The General Assembly cannot either usurp nor delegate the specific constitutional authority vested in the State Board by the People.

## II. *West Va. Bd. of Educ. v. Hechler*

This issue appears to be of first impression in our State. The sound analysis and holding of the Supreme Court of Appeals of West Virginia, which ruled upon this issue, is persuasive. *See West Va. Bd. of Educ. v. Hechler*, 180 W. Va. 451, 376 S.E.2d 839 (1988). The Constitution of West Virginia provides: "The general supervision of the free schools of the State shall be vested in the West Virginia board of education which shall perform such duties as may be prescribed by law." W. Va. Const. art. XII,

§ 2. The West Virginia legislature created a "legislative oversight commission on education accountability." *Hechler*, 180 W. Va. at 452, 376 S.E.2d at 840. As here, the Board of Education was purportedly required to submit its proposed rules to the oversight commission for review, and the commission would recommend that the legislature either promulgate the rule or the rule be withdrawn. *Id*. at 453, 376 S.E.2d at 840.

The West Virginia Supreme Court of Appeals held the state constitution granted the West Virginia Board of Education rulemaking powers, "and any statutory provision that interferes with such rule-making is unconstitutional," and the legislature's "attempt to undertake the Board's general supervisory powers" violates the separation of powers clause of the West Virginia Constitution. *Id*. at 455-56, 376 S.E.2d at 843.

In support of its holding, the court explained:

> Decisions that pertain to education must be faced by those who possess expertise in the educational area. These issues are critical to the progress of schools in this state, and, ultimately, the welfare of its citizens. . . . [T]he citizens of this state conferred general supervisory powers over education and one need not look further than art. XII, § 2 of the State *Constitution* to see that the "general supervision" of state schools is vested in the State Board of Education. *Unlike most other administrative agencies which are constituents of the executive branch, the Board enjoys a special standing because such a constitutional provision exists.*

*Id*. at 455, 376 S.E.2d at 842-43 (second emphasis supplied).

4

Our Constitution *specifically* gives the State Board the power to promulgate "needed rules and regulations" to set policy and to "*supervise and administer* the free public school system." *See* N.C. Const. art. IX, § 5 (emphasis supplied). The State Board is the only constitutionally created board, yet the RRC admitted during oral argument that it treats the Board and its proposed rules the same as any other "executive agency."

As explained in *Hechler*, the General Assembly's purported transfer of the State Board's constitutional authority to promulgate its own rules and regulations to an agency rule review entity denies the State Board an express power, which has been constitutionally conferred upon the State Board by the People.

Under the plain language of Article IX, the rulemaking authority of the State Board is "subject to limitation and revision by acts of the General Assembly." *Guthrie v. Taylor*, 279 N.C. 703, 710, 185 S.E.2d 193, 198 (1971), *cert. denied*, 406 U.S. 920, 32 L. Ed. 2d 119 (1972). While the General Assembly may "limit and revise," the State Board's exercise of its primary authority under Article IX, *see id.*, the State Board's power to establish educational policy and to promulgate its own rules and regulations does not derive its authority from, nor depend upon the General Assembly. By enacting the NCAPA, the General Assembly could not and did not transfer the State Board's constitutionally specified rulemaking power to an agency rule oversight commission under the NCAPA.

The legislative, executive, and judicial branches of government "shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. In interpreting this clause, our courts have long recognized that "a modern legislature must be able to delegate – in proper instances – a limited portion of its legislative powers to administrative bodies which are equipped to adapt legislation to complex conditions involving numerous details with which the Legislature cannot deal directly." *Adams v. N.C. Dep't of Nat. & Econ. Res.*, 295 N.C. 683, 697, 249 S.E.2d 402, 410 (1978) (citations and internal quotation marks omitted).

The rule in *Adams*, allowing the General Assembly to delegate a "limited portion of its legislative powers," does not apply here. "[S]uch powers as are specially conferred by the constitution upon the governor, or upon any other specified officer, the legislature cannot require or authorize to be performed by any other officer or authority; and from those duties which the constitution requires of him he cannot be excused by law." Thomas M. Cooley, *Cooley's Constitutional Limitations* 215 (8th ed. 1927). The People of North Carolina granted and conveyed to the State Board powers, which are not intended to be, and cannot be, removed from the State Board and subordinated to or overruled by an executive agency review body. *Id.*

Furthermore, in reviewing an agency's rule, the RRC determines whether the rule meets the following NCAPA criteria:

(1) It is within the authority *delegated to the agency by the General Assembly*.

6

(2) It is clear and unambiguous.

(3) It is reasonably necessary to implement or interpret an enactment of the General Assembly, or of Congress, or a regulation of a federal agency. The Commission shall consider the cumulative effect of all rules adopted by the agency related to the specific purpose for which the rule is proposed.

(4) It was adopted in accordance with Part 2 of this Article [which governs the rulemaking procedure].

N.C. Gen. Stat. § 150B-21.9(a) (2015) (emphasis supplied).

The authority of the State Board to promulgate its own rules and regulations to establish educational policy are constitutionally established and cannot be "delegated by the General Assembly." *See id.* Reviewing the plain language of the NCAPA, the RRC's mandate and standard for reviewing agency rules does not include rules that are promulgated *by a constitutionally created and empowered Board* expressly acting under their *constitutionally mandated authority.* The General Assembly's guiding standards to the RRC and definitions in the NCAPA support the State Board's position and the correctness of the superior court's ruling.

The Board of Education alleged and argues the RRC unreasonably delayed and has objected to or modified *every rule* adopted by the State Board and brought before the RRC since 1986. The State Board is tasked by the People with "constitutional obligations to provide the state's school children with an opportunity for a sound basic education." *Hoke Cty. Bd. of Educ. v. State*, 358 N.C. 605, 614-15, 599 S.E.2d 365, 376

(2004).

The members of the RRC are not required to have acquired or demonstrate any background or experience in public education, and need only be endorsed by the Speaker of the House or President of the Senate to serve on the RRC. N.C. Gen. Stat. § 143B-30.1(a) (2015). The asserted RRC delays, review, and rejection of State Board proposals unconstitutionally hinders the State Board's authority and mandate to "make all needed rules and regulations" to meet its constitutionally mandated obligations to "supervise and administer the free public school system and the educational funds provided for its support." N.C. Const. art. IX § 5.

Under the NCAPA, when the RRC strikes down a rule promulgated by the State Board, the only procedural safeguard and remedy is for the State Board to file suit to challenge the RRC in the Wake County Superior Court. *See* N.C. Gen. Stat. § 150B-21.8(d) (2015). This is a wholly untenable process for our school children, our citizens, and for establishing the constitutionally mandated "needed rules and regulations" that are required to implement the public educational policy of our State. N.C. Const. art. IX, § 5.

### III. Conclusion

By establishing a Board of Education with the specific constitutional authority to promulgate its own rules and regulations, the framers of Article IX and the People, upon ratifying the Constitution, vested the authority to administer and supervise

public education to the State Board, not the RRC. This intention is clearly set forth in the plain language of the Constitution in Article IX. The RRC review process has delayed and frustrated the State Board in accomplishing its constitutionally mandated mission.

The General Assembly cannot prohibit State Board from exercising its rulemaking powers under its constitutional grant of authority. The General Assembly also cannot accomplish the same result by delegating the State Board's constitutional rulemaking authority to a statutory entity the General Assembly has created for review of proposed executive agency rules under the NCAPA.

The State Board's constitutional authority and obligation to "make all needed rules and regulations" for the supervision and administration of the public school system does not function, and is not included, as a statutory or executive rulemaking agency under the NCAPA, with its rules subject to review by the RRC. The NCAPA cannot be applied to trump the constitutional rulemaking authority of the State Board of Education, and subject the State Board to the oversight authority the RRC applies to statutory State agencies.

Defendants have failed to show error in the superior court's judgment. The superior court's grant of summary judgment in favor of the State Board is properly affirmed. I respectfully dissent.