IN THE SUPREME COURT OF NORTH CAROLINA

No. 338PA23

Filed 17 October 2025

N.C. DEPARTMENT OF ENVIRONMENTAL QUALITY, DIVISION OF WATER RESOURCES

v.

N.C. FARM BUREAU FEDERATION, INC.

---

NORTH CAROLINA ENVIRONMENTAL JUSTICE NETWORK AND NORTH CAROLINA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE

v.

N.C. FARM BUREAU FEDERATION, INC.

and

N.C. DEPARTMENT OF ENVIRONMENTAL QUALITY, DIVISION OF WATER RESOURCES

On discretionary review pursuant to N.C.G.S. § 7A-31 and on writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review a unanimous decision of the Court of Appeals, 291 N.C. App. 188 (2023), reversing an order entered on 20 June 2022 by Judge Mark A. Sternlicht in the Superior Court, Wake County. Heard in the Supreme Court on 23 April 2025.

*Phillip Jacob Parker Jr., Stephen A. Woodson, Stacy Revels Sereno, and Meghan N. Cook; and Dowling PLLC, by Troy D. Shelton, for respondent-appellee North Carolina Farm Bureau Federation, Inc.*

*Jeff Jackson, Attorney General, by Marc Bernstein, Special Deputy Attorney General, and Taylor H. Crabtree, Assistant Attorney General, for petitioner-appellant N.C. Department of Environmental Quality, Division of Water Resources.*

*Southern Environmental Law Center, by Julia Furr Youngman, Blakely E. Hildebrand, and Jasmine Washington; and Irving Joyner for petitioner-appellants North Carolina Environmental Justice Network and North Carolina State Conference of the National Association for the Advancement of Colored People.*

*Mincey Bell Milnor, by Chad Rhoades and K. Landin Johnston, for National Federation of Independent Business Small Business Legal Center, Inc. and the N.C. Chamber Legal Institute, amici curiae.*

ALLEN, Justice.

With certain exceptions, the North Carolina Administrative Procedure Act (APA) mandates that administrative agencies provide the public with notice and an opportunity to comment on proposed rules. *See generally* N.C.G.S. §§ 150B-1 to -52 (2023) (Administrative Procedure Act). The APA's rulemaking process is not a pointless bureaucratic exercise. It represents an important check on the regulatory power of administrative agencies. The public notice and comment requirements of the APA discourage the arbitrary use of regulatory power by exposing agency rulemaking to public scrutiny.

In this case, the question is whether the North Carolina Department of Environmental Quality (DEQ) unlawfully circumvented the APA by adding three conditions to its general permits for animal waste management systems without formally adopting those conditions through the APA's rulemaking process. As explained below, we hold that the conditions qualify as "rules" and that substantial compliance with the APA's rulemaking requirements was necessary before the DEQ

imposed the conditions on farmers. Accordingly, we affirm the judgment of the Court of Appeals holding that "[t]he challenged conditions are invalid until they are adopted through the rulemaking process." *N.C. Dep't of Env't Quality v. N.C. Farm Bureau Fed'n, Inc.*, 291 N.C. App. 188, 196 (2023).

**I.**

Some thirty years ago, the General Assembly determined that "[t]he growth of animal operations . . . ha[d] increased the importance of good animal waste management practices to protect water quality." An Act to Implement Recommendations of the Blue Ribbon Study Commission on Agricultural Waste, ch. 626, § 1, 1995 N.C. Sess. Laws 164, 164 (codified at N.C.G.S. § 143-215.10A (2023)). Consequently, the legislature decided "to establish a permitting program for animal waste management systems that [would] protect water quality and promote innovative systems and practices while minimizing the regulatory burden" on farmers.[1] *Id.*

State law makes the Environmental Management Commission (EMC) responsible for the permitting program. N.C.G.S. § 143-215.10C(a) (2023). Specifically, it directs the EMC to "develop a system of individual and general permits

---

[1] As defined by state law, an "animal operation" is "any agricultural feedlot activity involving 250 or more swine, 100 or more confined cattle, 75 or more horses, 1,000 or more sheep, or 30,000 or more confined poultry with a liquid animal waste management system." N.C.G.S. § 143-215.10B(1) (2023). The phrase "animal waste management system" refers to "a combination of structures and nonstructural practices serving a feedlot that provide for the collection, treatment, storage, or land application of animal waste." *Id.* § 143-215.10B(3).

for animal operations." *Id.* The law further expresses the General Assembly's intent "that most animal waste management systems be permitted under a general permit," though it allows the EMC to require an individual permit for such a system "if the [EMC] determines that an individual permit is necessary to protect water quality, public health, or the environment." *Id.*

Compliance with the permitting program is not optional. *See id.* ("No person shall construct or operate an animal waste management system for an animal operation . . . without first obtaining an individual permit or a general permit under this Article."). Farmers who operate animal waste management systems without general or individual permits, or who violate permit conditions, can face civil or even criminal penalties. N.C.G.S. §§ 143-215.6A (2023) (civil penalties), -215.6B (2023) (criminal penalties).

The EMC may delegate its permitting authority to the Secretary of the DEQ or another qualified DEQ employee. *See* N.C.G.S. § 143-215.3(a)(4) (2023). It has availed itself of this option. 15A N.C. Admin. Code 2A.0105(a)(2) (2024). As a result, the permitting program is run by the DEQ's Division of Water Resources (Division).

The Division renews the general permits for animal waste management systems every five years. N.C.G.S. § 143-215.1(d2) (2023). One such renewal occurred in 2014. In response thereto, the North Carolina Environmental Justice Network (NCEJN) and other nonprofit organizations (complainants) filed a complaint with the United States Environmental Protection Agency's Office of Civil Rights. The

complaint alleged that the DEQ had discriminated based on race and national origin in its 2014 renewal of the general permit for animal waste management systems on swine farms.

On 3 May 2018, the DEQ entered into a settlement agreement with the complainants. The agreement included a draft general permit for animal waste management systems on swine farms. As part of the agreement, the DEQ pledged to submit the draft general permit "for consideration in its [s]takeholder [p]rocess."

Thereafter, the Division commenced the stakeholder process for its 2019 general permit renewal. The North Carolina Farm Bureau Federation (Farm Bureau) participated in the stakeholder process, providing oral and written input to the Division.

On 12 April 2019, the Division issued new general permits for swine, poultry, and cattle waste management systems. Each general permit contained three conditions that were not included in the 2014 general permits but that were part of the draft general permit in the 2018 settlement:

1. Permittees had to install monitoring wells for waste storage structures in the 100-year floodplain;

2. Permittees had to perform a Phosphorous Loss Assessment Tool (PLAT) analysis for fields with a high phosphorous index and satisfy mitigation requirements if the PLAT rating reached a certain level; and

3. Permittees had to submit annual reports summarizing the operations of

their respective systems.

On 10 May 2019, Farm Bureau filed three contested case petitions with the Office of Administrative Hearings (OAH) challenging the three new conditions. The OAH subsequently consolidated the petitions.

In its petitions, Farm Bureau alleged that the Division had "unlawfully circumvented the rulemaking procedures and requirements" of the APA by failing to adopt the conditions as rules. Farm Bureau further alleged that the Division had impermissibly failed to seek public input on the 2018 settlement agreement's draft general permit.[2]

Both the Division and Farm Bureau moved for summary judgment. On 9 February 2021, the administrative law judge (ALJ) assigned to the case issued the OAH's final decision granting summary judgment in favor of Farm Bureau on the first issue. Specifically, the ALJ pronounced the three conditions void after determining that: (1) the conditions satisfy the APA's definition of "rule"; (2) the Division is not exempt from the APA's rulemaking requirements; and (3) the Division's failure to comply with those requirements violated the APA. The ALJ granted summary judgment for the Division on the 2018 settlement agreement issue, however.

---

[2] The NCEJN and the North Carolina State Conference of the National Association for the Advancement of Colored People (NAACP) moved to intervene, but the OAH denied their motion. The superior court later reversed the OAH's ruling on intervention, but the parties have stipulated that intervention is not an issue on appeal.

The parties appealed the OAH's final decision to the Superior Court, Wake County. In an order entered on 20 June 2022, the court reversed the ALJ's ruling on the first issue and "reinstated [the three conditions] as valid." The court justified its decision on several grounds. To begin with, the court concluded that the conditions do not constitute rules for purposes of the APA's rulemaking requirements. The APA defines a "rule" to include"[a]ny agency regulation, standard, or statement of general applicability that implements or interprets an enactment of the General Assembly." N.C.G.S. § 150B-2(8a) (2023). In the court's view, the three general permit conditions are not rules because "[e]ach [animal waste management system] operator has the right to request an individual permit instead of a general permit." Since "only operators who choose to apply for coverage under a general permit are covered by the conditions in a general permit," the court reasoned that the conditions lack the general applicability necessary to qualify as rules under the APA.

The court further remarked that certain statutes distinguish between the adoption of rules and the issuance of permits. *See, e.g.*, N.C.G.S. § 150B-2(4) (defining "licensing" as "[a]ny administrative action *issuing*, failing to issue, suspending, or revoking a license or occupational license" (emphasis added)). According to the court, these distinctions in statutory terminology "support[ ] the conclusion that the three new conditions in the general permits and the permits [themselves] are not rules within the meaning of the APA."

Additionally, the court noted that in multiple legislative enactments the

General Assembly has required the Coastal Resources Commission (CRC) "to issue or revise general permits as rules." In the court's view, "[i]f the [l]egislature had intended [the] Division to issue general permits as rules, the [l]egislature could have done so as it did with the CRC."

The court also invoked the doctrine of legislative acquiescence. *See generally Brown v. Kindred Nursing Ctrs. E., L.L.C.*, 364 N.C. 76, 83 (2010) ("When the legislature chooses not to amend a statutory provision that has received a specific interpretation, we assume lawmakers are satisfied with that interpretation."). Observing that the General Assembly modified the Division's permitting process in 2003 without addressing the Division's practice of imposing new conditions through general permits, the court regarded the legislature's silence as tacit approval of that practice. *See* An Act to Provide for Extensions of the Expiration Dates of Certain General Nondischarge Permits for Animal Waste Management Systems that Serve Swine, Cattle, and Poultry Operations and to Direct the Department of Environment and Natural Resources to Study the Use of General Nondischarge Permits for Animal Waste Management Systems that Serve Swine, Cattle, and Poultry Operations to Protect Water Quality, S.L. 2003-28, § 1, 2003 N.C. Sess. Laws 25, 25.

Finally, with respect to the second issue—the Division's failure to seek public input on the draft general permit in the 2018 settlement agreement—the court upheld the ALJ's ruling in favor of the Division. Farm Bureau appealed from the

judgment of the superior court.[3]

On 7 November 2023, a unanimous panel of the Court of Appeals filed an opinion reversing the superior court's order. *N.C. Dep't of Env't Quality*, 291 N.C. App. at 196. Like the superior court, the Court of Appeals considered whether the three conditions amount to rules for APA purposes. *Id.* at 193–96. Unlike the superior court, it began with the first part of the APA's "rule" definition, analyzing whether the conditions should be classified as "regulation[s], standard[s], or statement[s]." *Id.* at 193; *see also* N.C.G.S. § 150B-2(8a). Because the APA does not define "regulation," the Court of Appeals consulted a dictionary and defined "regulation" to mean "an authoritative rule dealing with details or procedure." *N.C. Dep't of Env't Quality*, 291 N.C. App. at 193 (quoting *Regulation*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003)). The court determined that the three conditions fit this definition because, among other things, they "are authoritative, as the [Division] has the authority to grant permits, which are required to operate the animal-waste systems." *Id.*

The Court of Appeals then considered whether regulations must be generally applicable to qualify as rules under the APA. *Id.* at 194. Citing its earlier decision in *Wal-Mart Stores East, Inc. v. Hinton*, 197 N.C. App. 30 (2009), the court explained that the phrase "general applicability" in the APA's definition of "rule" modifies "regulation" and "standard" as well as "statement." *N.C. Dep't of Env't Quality*, 291

---

[3] The Division also filed a notice of appeal, but it did not challenge any of the superior court's rulings in its brief to the Court of Appeals.

N.C. App. at 194 (citing *Wal-Mart Stores E.,* 197 N.C. App. at 56). The Court of Appeals went on to conclude that the challenged general permit conditions are generally applicable because they "are to be used for 'most animal waste management systems.' " *Id.* at 195 (quoting N.C.G.S. § 143-215.10C(a) (2021)).

Having classified the conditions as rules for APA purposes, the Court of Appeals held that the conditions "are invalid until they are adopted through the rulemaking process." *Id.* at 196. The court's invalidation of the conditions made it unnecessary to consider Farm Bureau's allegations concerning the 2018 settlement agreement. *Id.*

The Division filed a petition for discretionary review with this Court pursuant to N.C.G.S. § 7A-31(c). We allowed the petition.[4]

**II.**

"On judicial review of an administrative agency's final decision, the substantive nature of each assignment of error dictates the standard of review." *N.C. Dep't of Env't & Nat. Res. v. Carroll,* 358 N.C. 649, 658 (2004). When, as in this case, a petition alleges that an administrative agency made an error of law, the superior court reviews the alleged error de novo, considering the matter afresh and freely

---

[4] The NCEJN and the North Carolina State Conference of the NAACP did not join the Division's petition for discretionary review. More than one year after the Division filed its petition, the two organizations filed a petition for writ of certiorari with this Court under Rule 21 of the North Carolina Rules of Appellate Procedure. We allowed their petition. In their brief to this Court, the NCEJN and the North Carolina State Conference of the NAACP adopt by reference the Division's arguments.

substituting its own judgment for that of the agency. *See* N.C.G.S. § 150B-51(c) (2023); *Carroll*, 358 N.C. at 659–60.

If the superior court's order is appealed, the Court of Appeals undertakes the twofold task of "(1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly." *ACT-UP Triangle v. Comm'n for Health Servs.*, 345 N.C. 699, 706 (1997) (cleaned up). "In the event that the case . . . reaches this Court after a decision by the Court of Appeals, the issue before this Court is whether the Court of Appeals committed any errors of law." *PHG Asheville, LLC v. City of Asheville*, 374 N.C. 133, 151 (2020).

## III.

Enacted in 1973 and recodified as Chapter 150B effective 1 January 1986, the APA establishes "a uniform system of administrative rule making and adjudicatory procedures for agencies." *N.C. State Bd. of Educ. v. State*, 371 N.C. 149, 156 (2018) (quoting N.C.G.S. § 150B-1(a) (2017)). The APA's provisions "allow and require, *inter alia*, notice to the public of proposed rules, public input regarding proposed rules, and due process for individuals affected by administrative rules and decisions." *N.C. State Bd. of Educ. v. State*, 255 N.C. App. 514, 524 (2017), *aff'd*, 371 N.C. 149 (2018). For the most part, agency rules are not valid unless adopted in "substantial compliance" with the APA's public notice and public input requirements. N.C.G.S. § 150B-18 (2023); *see also Cabarrus Cnty. Bd. of Educ. v. Dep't of State Treasurer*, 374 N.C. 3, 20 (2020) (recognizing "[a] presumption that the rulemaking provisions of the [APA]

apply to the formulation of rules . . . in the absence of an explicit or implicit exemption").

As noted above, the APA's definition of "rule" encompasses "[a]ny agency regulation, standard, or statement of general applicability that implements or interprets an enactment of the General Assembly." N.C.G.S. § 150B-2(8a). Significantly, no party to this appeal denies that the disputed general permit conditions implement or interpret legislation.[5] Rather, in their briefs to this Court, the parties concentrate on whether the challenged general permit conditions are regulations under the APA.

**A.**

The primary aim of statutory construction "is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664 (2001). A court's efforts to identify that intent "must begin with an examination of the relevant statutory language." *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547 (2018). "Where the language of a statute is clear, the courts must give the statute its plain meaning; however, where the statute is ambiguous or unclear as to its meaning, the courts must interpret the statute to give effect to the legislative intent." *Frye Reg'l Med. Ctr., Inc. v. Hunt*, 350 N.C. 39, 45 (1999).

---

[5] Moreover, although the APA expressly excludes certain agency pronouncements from its definition of "rule," no party to this appeal contends that any such exclusion covers the general permit conditions. *See, e.g.*, N.C.G.S. § 150B-2(8a)(h) (exempting from the APA's definition of "rule" all "[s]cientific, architectural, or engineering standards . . . used to construct or maintain highways, bridges, or ferries").

Because the APA does not define "regulation," the Court of Appeals rightly concluded that the word should be given its "common and ordinary meaning." *N.C. Dep't of Env't Quality*, 291 N.C. App. at 193 (quoting *In re Clayton-Marcus Co.*, 286 N.C. 215, 219 (1974)). As this Court has said, "[i]n the construction of any statute, . . . words must be given their common and ordinary meaning, nothing else appearing." *Clayton-Marcus Co.*, 286 N.C. at 219. The Court of Appeals thus did not err in defining the term "regulation" to mean "an authoritative rule dealing with details or procedure." *N.C. Dep't of Env't Quality*, 291 N.C. App. at 193 (quoting *Regulation*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003)).

The challenged general permit conditions obviously satisfy this definition of "regulation." They involve "details or procedure," requiring as they do, for example, that farmers who obtain general permits file annual reports about their operations. And the conditions are unquestionably "authoritative." Farmers with general permits can face civil or even criminal penalties if they fail to comply with the conditions.

The Division nonetheless argues that the conditions do not constitute regulations under the APA's definition of "rule" in N.C.G.S. § 150B-2(8a) because they are not generally applicable. In the Division's reading of N.C.G.S. § 150B-2(8a), the phrase "general applicability" modifies the terms "regulation," "standard," and "statement." Thus, according to the Division, only generally applicable regulations qualify as rules withing the meaning of N.C.G.S. § 150B-2(8a).

In response, Farm Bureau invokes the last antecedent canon. According to that

canon of statutory construction, "relative and qualifying words, phrases, and clauses ordinarily are to be applied to the word or phrase immediately preceding and, unless the context indicates a contrary intent, are not to be construed as extending to or including others more remote." *HCA Crossroads Residential Ctrs. v. N.C. Dep't of Hum. Res.*, 327 N.C. 573, 578 (1990). When construed in accordance with the last antecedent canon, Farm Bureau insists, "the words 'of general applicability' [in N.C.G.S. § 150B-2(8a)] modify only the word 'statement,' and not the words 'regulation' or 'standard.'" For this reason, Farm Bureau asserts that the challenged permit conditions constitute rules for APA purposes, "regardless of their general applicability."

"Canons of construction are interpretive guides, not metaphysical absolutes. They should not be applied to reach outcomes plainly at odds with legislative intent." *Town of Midland v. Harrell*, 385 N.C. 365, 376 (2023). As the Division persuasively argues, Farm Bureau's reading of N.C.G.S. § 150B-2(8a) would lead to extreme, if not absurd, results:

> The upshot is that any permit condition that controls the conduct of the permittee meets the definition of "rule." But this proves far too much. Almost every condition in every permit—including every individual permit—controls the conduct of the permittee and would be a rule . . . . Farm Bureau's interpretation would [thus] require that almost every condition in every individual permit issued by any agency—even if the condition applied to only one entity—must clear the APA's full rulemaking process.

(Citation omitted.)

We agree that the legislature could not have intended such an outcome. Consequently, we hold that a regulation must be generally applicable to trigger the APA's rulemaking requirements. *See generally State v. Barksdale*, 181 N.C. 621, 625 (1921) ("[W]here a literal interpretation of the language of a statute will lead to absurd results . . . the reason and purpose of the law shall control and the strict letter thereof shall be disregarded.").

Having so held, we next analyze whether the disputed general permit conditions meet this threshold. As with "regulation," the APA does not define the phrase "general applicability." Relying on its own precedent to supplement the APA, the Court of Appeals explained that "[a] rule is generally applicable if it applies to most situations." *N.C. Dep't of Env't Quality*, 291 N.C. App. at 195 (citing *Wal-Mart Stores E.*, 197 N.C. App. at 56). The court's definition of "general applicability" aligns with at least one commonly accepted meaning of "general." *See General*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) (defining "general" as "applicable to or characteristic of the majority of individuals involved").

The Division contends that the conditions are not generally applicable "for the simple reason that nobody has to comply with any conditions in the General Permits unless someone opts into the General Permit." In making this argument, the Division cites a regulation that allows operators of animal waste management systems to apply for individual permits instead of general permits. *See* 15A N.C. Admin. Code 2T.0111(g) (2024) ("Any individual covered or considering coverage under a general

permit may choose to pursue an individual permit for any operation covered by this Rule.").

The Division further argues that the Court of Appeals' approach to "general applicability" is problematic for at least two reasons:

> . . . First, if terms in a general permit become "generally applicable"—and thus are rules—when most of the potential permittees opt into that general permit, then it is impossible to determine whether the permit is a rule and needs to go through the formal rulemaking process until after the agency actually begins implementing the permit. . . . At any point, if the number of potential permittees opting into the permit hits some critical mass— becomes "most"—then the permit instantly becomes a rule. . . .

> Second, even if the agency could predict with absolute accuracy what percentage of potential permittees would opt into a general permit, the Court of Appeals' "applies to most" standard is so unclear as to be impossible to apply with any certainty. What is the precise threshold by which "most" permittees are deemed to have opted for the General Permit? The Court of Appeals does not say.

Whatever merit the Division's arguments might have in other regulatory contexts, we find them unpersuasive on the facts of this case. As remarked previously, state law instructs the EMC to "develop a system of individual and general permits for animal operations." N.C.G.S. § 143-215.10C(a). One could plausibly assert that by referring to one category of permits as *general* permits, the legislature implied that most permits issued for animal waste management systems must fall into that category.

But we need not speculate about what the legislature had in mind. The

permitting statute itself declares unequivocally that "*[i]t is the intent of the General Assembly that most animal waste management systems be permitted under a general permit.*" *Id.* (emphasis added). Consistent with this legislative intent, the General Assembly has invested the EMC—not permit applicants—with the authority to decide which animal waste management systems should receive individual permits. *Id.* Exercising this authority on behalf of the EMC, the Division "may require that an animal waste management system . . . be permitted under an individual permit if [it] determines that an individual permit is necessary to protect water quality, public health, or the environment." *Id.*

Hence, although by regulation applicants may apply for either general or individual permits, the General Assembly has mandated that general permits predominate. The Division thus has no choice but to ensure that most animal waste management systems operate under general permits. As this Court recently reiterated, "[a]n administrative agency 'is a creature of the statute creating it and has only those powers expressly granted to it or those powers included by necessary implication from the legislative grant of authority.' " *N.C. Dep't of Revenue v. Philip Morris USA, Inc.*, No. 242A23, slip op. at 14–15 (N.C. Aug. 22, 2025) (quoting *In re Broad & Gales Creek Cmty. Ass'n*, 300 N.C. 267, 280 (1980)).

Moreover, the Division has frankly admitted to this Court that "[t]he majority of the over 2,600 [animal waste management] operations that are eligible for coverage under one of the General Permits opt to seek coverage under that permit rather than

an individual permit." It is therefore beyond dispute that the Division must and indeed does issue general permits to most operators of animal waste management systems.

It follows from what we have said so far that the three challenged general permit conditions qualify as "agency regulation[s] . . . of general applicability that implement[ ] or interpret[ ] an enactment of the General Assembly." *See* N.C.G.S. § 150B-2(8a). Accordingly, the conditions are subject to the APA's rulemaking requirements "in the absence of an explicit or implicit exemption." *See Cabarrus Cnty. Bd. of Educ.*, 374 N.C. at 20.

**B.**

In its principal brief to this Court, the Division contends that the General Assembly has demonstrated through "a host of legislative enactments" that it "never intended the General Permits to be a suite of rules." The Division attempts to support this contention by essentially repeating arguments accepted by the superior court. The Division asserts, for instance, that "the APA repeatedly and consistently speaks of 'rules' being 'adopted,' " while it "uses the term 'issue' when discussing other types of agency actions, such as . . . licenses, which include[ ] permits." *Compare, e.g.*, N.C.G.S. §§ 150B-18, -19, -19.1, -19.3 (2023) (all using "adopt" in reference to rules), *with id.* §§ 150B-2, -3, -4 (2023) (all using "issue," "issued," or "issuance" to describe other agency actions). As far as the Division is concerned, "[t]he General Assembly's consistent use of [these] terms . . . [is] strong evidence that lawmakers intended these

'permits' be only 'issued' and not formally 'adopted' as 'rules.' "[6]

Like the superior court, the Division also points to legislation that authorized the CRC to issue general permits "as rules." *See* An Act to Allow the Coastal Resources Commission to Issue General Permits Under the Coastal Area Management Act and Under the Dredge and Fill Law, ch. 171, § 1, 1983 N.C. Sess. Laws 121, 121. In the Division's view, "[t]he fact that the General Assembly . . . did not dictate that the Division use this process evidences lawmakers' clear intent that the General Permits need not be adopted as rules."

Lastly, the Division notes that the General Assembly has legislated several times regarding general permits for animal waste management systems without expressly requiring the Division to adopt such permits as rules. *See, e.g.*, An Act to Make Various Changes to the Laws Concerning Agriculture and Forestry, S.L. 2021-78, § 11(d), 2021 N.C. Sess. Laws 258, 268 (directing the EMC to develop and issue a general permit for farm digester systems). According to the Division, "[t]his history strongly shows that the General Assembly did not intend the Permitting Statute to require rulemaking."

These arguments all miss the mark. We do not hold today that the general permits themselves must satisfy the rulemaking procedures of the APA. Rather, we

---

[6] In its brief to this Court, Farm Bureau insists that "the General Assembly does not consistently use the word 'issue' to refer to permits and 'adopt' to refer to rules." Its counter-examples include N.C.G.S. § 115C-436(b), which authorizes the State Board of Education "to *issue* rules and regulations having the force of law." N.C.G.S. § 115C-436(b) (2023) (emphasis added).

hold that the Division may not evade the APA by using general permits to impose generally applicable regulations that have not gone through the rulemaking process. Put differently, if the disputed conditions had been properly adopted first as rules, then the Division's inclusion of them in the general permits would not violate the APA. It is the conditions—not the permits—that are subject to the APA's rulemaking requirements.

To accept the Division's view of the law would be to eliminate any need for the EMC to adopt rules for animal waste management systems. Without ever providing the public with the notice or opportunity to be heard mandated by the APA, the Division could impose burdensome and costly requirements on a majority of farmers with animal waste management systems simply by turning those requirements into general permit conditions. Because we do not think the General Assembly meant to exempt the regulation of animal waste management systems from the APA's rulemaking process, we must reject the Division's legal interpretation.

## C.

Farm Bureau did not request discretionary review of the Court of Appeals' disposition of its claim that the Division impermissibly failed to invite public input on the draft general permit in the 2018 settlement agreement. Thus, that issue is not properly before this Court. *See* N.C. R. App. P. 16(a).

## IV.

The three general permit conditions challenged by Farm Bureau are "rules"

within the meaning of the APA and subject to the APA's rulemaking requirements. Because the conditions were not adopted through the APA's rulemaking process, the Court of Appeals correctly held that the superior court erred by reversing the OAH's final decision striking down the conditions. The judgment of the Court of Appeals is therefore affirmed.

AFFIRMED.

Justice EARLS dissenting.

Large animal farms with hundreds of hogs, cattle, and poultry produce large amounts of animal waste—waste which can be harmful to public health and the environment if not properly managed. State and federal laws require such farms to follow certain procedures, including obtaining permits so they can operate. Relevant here, state permits for farms serving "250 or more swine" contain conditions related to animal waste management—more than eighty of them. Those conditions require, for example, that dead animal carcasses be properly disposed of and that animal waste not be applied directly "onto crops for direct human consumption" or too close to streams, rivers, or neighboring houses. *See* N.C. Env't Mgmt. Comm'n, Dep't of Env't Quality, Swine Waste Management System General Permit 1, 4–5 (Apr. 12, 2019), https://files.nc.gov/ncdeq/General-Permit---Swine-2019.pdf (last visited Oct. 14, 2025). The conditions also include "monitoring and reporting requirements" to facilitate state oversight of permit compliance. *Id.* at 8.

The North Carolina Farm Bureau Federation, an industry group that represents some of the regulated large animal farmers, initiated this action to invalidate three of the conditions in these permits. Those conditions require farms with waste structures within the one-hundred-year floodplain to have ground water monitoring wells, farms with high enough phosphorous indexes to conduct "phosphorous loss assessment tool" analysis and mitigation, and that all farms submit annual reports summarizing the animal waste system's operations. *See id.* at

3, 10, 12. These conditions are invalid, it argued, because they were not first adopted via notice-and-comment rulemaking.

Fundamentally, the Farm Bureau asked this Court to expand what qualifies as a "rule" under the Administrative Procedure Act (APA), so that rulemaking would be required whenever an agency "control[s]" how farmers do business. It argued that the proper way to interpret the APA is to look to dictionary definitions of technical words—in its view, all agency actions that could conceivably fit those broad definitions require notice-and-comment rulemaking. As counsel for the Farm Bureau put it, this way of interpreting the APA shows that "the General Assembly intends for a lot of agency action to go through the rulemaking process."[1]

This is not how administrative law works. But the majority accepts the Farm Bureau's unsound reasoning. It uses ordinary dictionaries to define the APA's technical terms and sets out to classify agency actions using those broad definitions, seemingly irrespective of what the legislature instructed the agency to do or the actual form the agency action takes. *See* majority *supra* Part III.B. It does not explain what distinguishes the three challenged conditions from any of the other eighty-some conditions in the general permit—nor does it explain why the conditions in this general permit are different from the twenty-something other general industrial permits which apply "most" of the time. The majority opinion seems to cast entire

---

[1] Oral Argument at 42:30, *N.C. Dep't of Env't Quality v. N.C. Farm Bureau Fed'n, Inc.* (No. 338PA23) (Apr. 23, 2025), https://www.youtube.com/watch?v=nj132VH4xX8 (last visited Oct. 14, 2025).

permitting regimes designed to protect public health into uncertainty, and I respectfully dissent.

## I. The APA and the Animal Waste Management Statute's "Flexib[le]" "Permitting" System

Whether the challenged conditions in the swine waste management system general permit are invalid because they did not first undergo notice-and-comment rulemaking presents a question of how the APA must be read in conjunction with an "organic" statute an administrative agency is tasked with implementing. We must read both statutes in harmony to give effect to the legislature's intent. *See Empire Power Co. v. N.C. Dep't of Env't, Health & Nat. Res.*, 337 N.C. 569, 591, 593 (1994) (reading an organic statute and the APA "*in pari materia*" to "give effect to both").

The APA is a cross-cutting statute that gives procedural protections against different agency actions. N.C.G.S. § 150B-1(a) (2023). It is "cross-cutting" because it applies to all administrative agencies, except those that are specifically excluded. N.C.G.S. § 150B-1(c). It addresses two main types of agency actions. The first are those subject to rulemaking under Article 2A, which involve "general categories or classes of parties and facts and policies of general applicability." Charles E. Daye, *North Carolina's New Administrative Procedure Act: An Interpretive Analysis*, 53 N.C. L. Rev. 833, 868 (1975). Such rulemaking contains extensive notice-and-comment protections for affected parties and over twelve different steps that give the public an opportunity to be heard. *See Adoption of Permanent Rules*, N.C. Off. of Admin. Hearings, https://www.oah.nc.gov/rules-division/participating-rulemaking-

process/adoption-permanent-rules (last visited Oct. 14, 2025). The second are those actions subject to adjudication under Article 3 and Article 3A, which involve "a specifically named party and a determination of particularized legal issues and facts with respect to that party." Daye, *North Carolina's New Administrative Procedure Act*, at 868. Put another way, rulemaking protections apply to agency directives that legally bind a class, and adjudicative protections apply to agency directives that legally bind specific individuals.[2]

The APA stands in contrast to an "organic" or enabling statute which substantively defines a particular agency's responsibilities and the rights and duties of parties affected by that agency. *Id.* at 835 n.4. Once an organic statute defines what a particular agency is to do, then the APA tells parties what procedural rights and duties apply. *Empire Power Co.*, 337 N.C. at 583. Thus to know what APA protections apply, you have to know what the organic statute tells the agency to do. The analytical starting point is the organic statute.[3]

Here, the relevant organic statute is in Article 21 of Chapter 143 of the General

---

[2] The United States Supreme Court has also clarified that legally binding general directives to a small class that depend on adjudicative facts may also be orders, not rules. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915).

[3] *See, e.g.*, *N.C. State Bd. of Educ. v. State*, 371 N.C. 170, 188 (2018) (starting with analysis of the organic statute, which changed powers between the Board of Education and the state superintendent, before analyzing whether that statute triggered rulemaking by its reference to the Board's authority to set "rules and regulations"); *State Acupuncture Licensing Bd. v. N.C. Bd. of Physical Therapy Exam'ers*, 371 N.C. 697, 701–02, 705 (2018) (starting with analysis of the physical therapy board's enabling statute before interpreting whether its policy statements were "statements of general applicability" that require rulemaking (cleaned up)).

Statutes, which generally governs the state's "water and air resources." Our legislature recognized that "good animal waste management practices" are "importan[t] . . . to protect water quality." N.C.G.S. § 143-215.10A (2023). So it endeavored to regulate animal waste management systems for some of the largest farms: those farms that have "250 or more swine, 100 or more confined cattle, . . . or 30,000 or more confined poultry with a liquid animal waste management system." N.C.G.S. § 143-215.10B(1) (2023). At the time of this litigation, over 2,000 swine, cattle, and wet poultry farms across North Carolina fell into these categories.

These state laws appear to build on federal regulations under the Clean Water Act, some of which "focus[ ] on the 5% of the nation's animal feeding operations . . . that present[ ] the highest risk of impairing water quality and public health." *See* Revised National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitations Guidelines for Concentrated Animal Feeding Operations in Response to the Waterkeeper Decision, 73 Fed. Reg. 70418, 70419 (Nov. 20, 2008); N.C.G.S. § 143-215.10C(a)–(b1) (2023) (incorporating by reference federal law regulations for certain state law requirements).

Even as these high-volume animal farms bring "significant economic and other benefits to this State," the legislature recognized that "[i]t is critical that the State balance [such] growth with prudent environmental safeguards." N.C.G.S. § 143-215.10A. The legislature apparently believed that the state could best achieve that "balance" by "establish[ing] a permitting program for animal waste management

systems that will protect water quality and promote innovative systems and practices while minimizing the regulatory burden." *Id.*

Thus the statutes prohibit any person from "construct[ing] or operat[ing] an animal waste management system . . . without first obtaining an individual permit or a general permit under this Article," and they instruct the Environmental Management Commission to "develop a system of individual and general permits for animal operations and dry litter poultry facilities based on species, number of animals, and other relevant factors." N.C.G.S. § 143-215.10C(a).

The permitting system is intended to maximize regulatory flexibility, innovation, and efficiency, as the legislature made expressly clear. For example:

- "The Commission shall encourage the development of alternative and *innovative* animal waste management technologies." N.C.G.S. § 143-215.10C(g) (emphasis added).

- "The Commission shall provide sufficient *flexibility* in the regulatory process to allow for the *timely* evaluation of alternative and *innovative* animal waste management technologies" and "sufficient *flexibility* in the regulatory process to allow for the *prompt* implementation of alternative and *innovative* animal waste management technologies that are demonstrated to provide improved protection to public health and the environment." *Id.* (emphases added).

- Permits are to be approved quickly,[4] and any "permit applicant, . . . permittee, or . . . third party" who is "*dissatisfied*" by what the Commission "deci[ded]" may initiate a contested case hearing under the adjudicatory protections of the APA. An Act to Provide Further Regulatory Relief to the Citizens of North Carolina, S.L. 2023-137, § 15(b), 2023 N.C. Sess. Laws 1384, 1397–98 (emphasis added) (citing N.C.G.S. § 150B-23) (to be codified at N.C.G.S. § 143-215.10C(*l*)).

- The goal is "a *cooperative* and coordinated approach to animal waste management among the agencies of the State." N.C.G.S. § 143-215.10A (emphasis added).

Related to this goal of regulatory flexibility, the legislature intended that most permittees would be "permitted under a general permit," and that individual permits may be required where the Commission determines it "is necessary to protect water quality, public health, or the environment." N.C.G.S. § 143-215.10C(a). Presumably, applying for and receiving the "general" or default permit is easier and faster for operators than having to negotiate terms in an "individual permit"—i.e., having a default option "minimize[es] the regulatory burden." *See* N.C.G.S. § 143-215.10A. But nothing in the statute requires an animal waste management system operator to

---

[4] *See* N.C.G.S. § 143-215.10C(c1) (requiring the Commission to "make a final permitting decision" under a general permit within ninety days of receiving an operator's completed notice of intent); *id.* at (c) ("The Commission shall act on a permit application as quickly as possible . . . .").

obtain a general permit specifically.

Moreover, the legislature limited the Commission's discretion to create permit conditions: "No permit shall be denied, *and no condition shall be attached to a permit,* except when the Commission finds that the denial or *conditions are necessary to effectuate the purposes* of this Part." 2023 N.C. Sess. Laws at 1397 (emphases added) (to be codified at N.C.G.S. § 143-215.10C(c)). The statute itself enumerates several required components for an animal waste management plan, N.C.G.S. § 143-215.10C(e), including steps an operator must take in the event it discharges thousands of gallons or more of animal waste into the state's surface waters, *id.* at (h). Some of the state's requirements incorporate by reference existing federal requirements. *Id.* at (a1)–(b1). And the legislature expressly identified the purposes for which the conditions must be effectuated: the legislature's policy goal of "balanc[ing] growth with prudent environmental safeguards." N.C.G.S. § 143-215.10A.

The organic statute's description of the "flexib[le]" "permitting" system does not use any of the typical words we expect to see when a statute requires notice-and-comment rulemaking, such as "rule," "regulate," "generally applicable," or "adopt." Notably when this "flexib[le]" "permitting" statute does use the word "rule," it does so in a way that has a distinct meaning from "permit" or attached permit "conditions." *Compare* 2023 N.C. Sess. Laws at 1397 (to be codified at N.C.G.S. § 143-215.10C(j)) (noting that a permittee's compliance boundary "may be established *by rule or permit*"

(emphasis added)), *with* 2023 N.C. Sess. Laws at 1397 (to be codified at N.C.G.S. § 143-215.10C(c)) ("[N]o *condition* shall be attached to a *permit*, except when the Commission finds that the denial or conditions are necessary to effectuate the purposes of this Part." (emphases added)). This distinction is consistent with neighboring subsections. For example, one distinguishes between permit "conditions" on the one hand, and on the other, activities where the Commission may decline to require "[i]ndividual or general permits" and instead "establish[ ]" "[p]erformance conditions . . . *by rule.*" N.C.G.S. § 143-215.1(a)(4), (b)(4)(e) (2023) (emphasis added).

Moreover, where the "flexib[le]" "permitting" system in this organic statute does mention APA protections, it specifically triggers those associated with the adjudicative process rather than the rulemaking process. "[D]issatisfied" parties, broadly construed, "may commence a contested case" under Article 3 of the APA, the APA provision which applies to adjudicative actions, 2023 N.C. Sess. Laws at 1397–98 (to be codified at N.C.G.S. § 143-215.10C(*l*)); *see* N.C.G.S. § 150B-23 (2023), and expressly excludes rulemaking, N.C.G.S. § 150B-2(2) (2023) (defining "[c]ontested case" to exclude "rulemaking").

Now understanding what the organic statute instructs the agency to do, we turn to the APA. Article I outlines approximately twenty technical definitions of APA terms: for example, a "[l]icense" is "[a]ny certificate, *permit*, or other evidence, by whatever name called, of a right or privilege to engage in any activity," with some exceptions not relevant here. *Id.* at (3) (emphasis added). A "[c]ontested case" is "[a]n

administrative proceeding . . . to resolve a dispute between an agency and another person that involves the person's rights, duties, or privileges, *including licensing* or the levy of a monetary penalty." *Id.* at (2) (emphasis added). It "does not include rulemaking." *Id.*

A "[r]ule," by contrast, is "[a]ny agency regulation, standard, or statement *of general applicability* that implements or interprets an enactment of the General Assembly." *Id.* at (8a) (emphasis added). As we have explained, agency directives are "generally applicable" when they act like legislation and directly bind a class. *See State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 300 N.C. 381, 411 (1980) ("[R]ules fill the interstices of statutes. They go beyond mere interpretation of statutory language or application of such language and within statutory limits set down additional substantive requirements." (cleaned up)), *abrogated in part on other grounds*, *In re Redmond*, 369 N.C. 490, 497 (2017)); *accord* Daye, *North Carolina's New Administrative Procedure Act*, at 838 (noting that rules are pronouncements of "general applicability").

The three challenged conditions in the swine waste management system general permit do not require notice-and-comment rulemaking, because the permit conditions are part of a "license" that stipulates individual rights and duties, subject to protections in the adjudicative process. The conditions are not "generally applicab[le]" pronouncements, *see* N.C.G.S. § 150B-2(8a), because they do not directly regulate a class; they carry the force of law only when a permit recipient opts to apply

for and receive a general permit with the conditions attached, *see* Daye, *North Carolina's New Administrative Procedure Act*, at 838. The Division seems to have no capacity to force anyone to obtain a general permit at all. Any operator may opt for an individual permit, as the first page of the general permit indicates. *See* N.C. Env't Mgmt. Comm'n, Dep't of Env't Quality, Swine Waste Management System General Permit 1 (Apr. 12, 2019), https://files.nc.gov/ncdeq/General-Permit---Swine-2019.pdf (last visited Oct. 14, 2025); *accord* 15A N.C. Admin. Code 2T.0111(g). Even as "[i]t is the intent of the General Assembly that most animal waste management systems be permitted under a general permit," *see* N.C.G.S. § 143-215.10C(a), as the majority stresses, it is also the General Assembly's intent that the permitting system—and specifically the conditions attached to a permit and the technologies incorporated by those conditions—remain "flexib[le]," "innovative," "prompt," and dependent on myriad "relevant factors," *see id.* at (a), (g). None of this plain language signals the slow-moving, intentionally deliberative process typical of notice-and-comment rulemaking. Reading the APA and the organic statute together as we must, *see Empire Power Co.*, 337 N.C. at 593, the animal waste management statute does not contemplate a system of permit conditions adopted as rules.

Confirming this interpretation is the legislature's recent indication that the animal waste general permit be drafted *through a procedure other than the rulemaking process*. In 2003, the General Assembly directed the Division to extend the life of the existing general permit, study its impact on certain environmental

conditions, and recommend changes accordingly. Act of Apr. 30, 2003, S.L. 2003-28, §§ 1–2, 2003 N.C. Sess. Laws 25, 25–26. The legislation incorporated by reference the Division's existing process for receiving stakeholder comment on draft permits—a process distinct from Article 2A's rulemaking procedures and consistent with the Division's present-day procedures. *Compare id.* (making revision of the draft general permit expressly "[s]ubject to the provisions of" the Division's promulgated rules, which included provisions requiring notice and a thirty-day comment period for a general permit draft, and instructing new drafts to be "circulate[d] . . . among interested parties for comment" (citing 15 N.C. Admin. Code 2H.0225 (1997) (repealed 2006))),[5] *with* 15A N.C. Admin. Code 2T.0111(b) (requiring notice and thirty-day comment period for "interested persons" to comment on a "draft general permit"). It is difficult to conclude that the legislature intended general permit conditions to go through notice-and-comment rulemaking when the legislature expressly instructed the Division to draft general permit conditions through a different process—and indeed referenced the Division's existing stakeholder review process in doing so.

It bears emphasizing that even though the general permits and their attached conditions are not "rules," they are still "licenses" subject to adjudicatory protections. Every party in a contested case hearing can challenge an agency action, including

---

[5] The word "circulate" is never used in the elaborate steps involved in notice-and-comment rulemaking for a permanent rule under Article 2A. *See* N.C.G.S. §§ 150B-18 to 21.28 (2023).

receipt or denial of a permit or conditions attached to that permit, as unlawful. N.C.G.S. § 150B-23(a). For animal waste management system permits specifically, if the permittee or "a third party" is "dissatisfied" with their permit conditions, then they can challenge the permit conditions as arbitrary and capricious, erroneous, or otherwise in excess of the Division's statutory authority at a contested case hearing. *See id.*; 2023 N.C. Sess. Laws at 1397–98 (to be codified at N.C.G.S. § 143-215.10C(*l*)). Ruling for the Division does not allow it to "evade" the APA's protections because the APA applies different protections to all covered administrative actions. This Court need not invalidate an entire general permitting regime to ensure large animal farmers are protected by the APA and that the Division is exercising only that authority given to it by the legislature.

## II.    The Majority's Misapprehension of the APA

My most fundamental disagreement with the majority is methodological: we cannot reasonably interpret the interaction between the APA and the organic statute by looking first to the APA, giving the APA's technical terms dictionary meanings, and then working backwards to the agency action.

The first cue that something is wrong with the majority's reasoning here comes from its tautological definitions. It sees that "rule" is defined by the APA as a "regulation," so it dictionary defines "regulation" as an "an authoritative *rule* dealing with details or procedure." *See* majority *supra* Part III.A (emphasis added) ("The Court of Appeals thus did not err in defining the term "regulation" to mean "an

authoritative rule dealing with details or procedure." (quoting *N.C. Dep't of Env't Quality v. N.C. Farm Bureau Fed'n, Inc.*, 291 N.C. App. 188, 193 (2023) (quoting *Regulation, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003)))). This substitutes the APA's technical definition of "rule" with an ordinary person's, contrary to blackletter law that technical words are given their technical meanings. *E.g.*, *State v. Coker*, 312 N.C. 432, 435 (1984).

Giving technical words their technical meanings has special purchase in the administrative law context. The APA is a sophisticated and highly technical system of unified procedures that governs how nearly all of state government operates, modeled on the federal APA that governs how nearly the entire national government operates. Daye, *North Carolina's New Administrative Procedure Act*, at 835, 886 (noting that the enactment of the North Carolina APA marked "the first time [the State] will have a comprehensive statute governing major parts of the procedures by which most agencies of the State execute their functions . . . [and will] govern the relationship between the agencies and citizens affected by agency action and the relationship between agencies and the courts," and that it was in part "modeled after the Federal APA"). In an ordinary meaning sense, the entire APA is an "authoritative rule dealing with details or procedure." *See* majority *supra* Part III.A. That cannot sensibly be the key definition for only one part of it.

Common sense confirms this point. Ordinary people use the word "rule" all the time, referring to constitutional doctrine, statutes, regulations, ordinances, a state

park's "Frequently Asked Questions" webpage, or even verbal instructions from a bossy public parking attendant. But the APA does not require notice-and-comment rulemaking in all such cases. Defining "rule" to cover all such circumstances renders the APA's carefully designed adjudicative and rulemaking schemes almost meaningless.

The majority rightly recognizes that notice-and-comment rulemaking is only required for regulations that are "generally applicable." *See* majority *supra* Part III.A (citing N.C.G.S. § 150B-2(8a)). But it then concludes that the challenged general permit conditions are "generally applicable" because the general permits themselves are intended to cover "most animal waste management systems." *See id.* (quoting N.C.G.S. § 143-215.10C(a)). This reasoning is curious, though, because even if permit conditions were generally applicable when they apply to "most" operators, the record shows that two of the three challenged permit conditions apply to only a tiny share of operators. At the time of summary judgment, the Division had identified only around fifty swine and cattle facilities out of the over two-thousand subject to this permitting regime that had waste structures in the one-hundred-year floodplain. So that challenged condition would appear to regulate approximately three percent of animal waste operators governed by these statutes. Similarly, the Division calculated that only around five percent of animal waste operation fields had a phosphorous index high enough to be potentially affected by that challenged condition. So this challenged condition, too, regulates only a tiny share of operators. The majority's

reasoning thus fails on its own terms, because these challenged conditions do not even apply to "most" permittees.

The logic of the majority's rule appears to be that agency directives are "generally applicable" when they appear in a "general" or default permit option, regardless of the share of individuals actually affected by the condition. But this rule would seem to represent an overly broad construction of the APA that risks undermining the legislature's intent as expressed in the underlying organic statutes. Contrary to the majority, I do not believe statutes creating flexib[le]" "permitting" systems necessarily require the same agency conduct as statutes that clearly instruct an agency to promulgate rules governing a broader class—even if both contemplate a "default" permit option. The majority's rule appears to cast a shadow of uncertainty over the more than twenty other "general" industrial permits of great importance to businesses and consumers—such as but not limited to construction activities, mining activities, metal fabrication, leather/rubber/apparel/printing, stone/clay/glass, paints and varnishes, airports, ready-mixed concrete, asphalt paving, textile mills, scrap metal, timber products, marinas and shipbuilding, and furniture manufacture.[6]

If the majority continues down this path, what is at stake is the state's ability to carry out duties assigned to it by the people and their elected representatives. The

---

[6] *See* General Industrial Permits, N.C. Dep't of Env't Quality, https://www.deq.nc.gov/about/divisions/energy-mineral-and-land-resources/stormwater/stormwater-program/npdes-industrial-program/general-industrial-permits (last visited Oct. 14, 2025).

majority's holding is limited to the three conditions challenged here, but its reasoning is not. The majority does not explain what distinguishes the three challenged conditions from any of the other eighty-some conditions in the general permit, or why this general permitting regime is different from the innumerable other permitting regimes with a default or general permit option. I do not think the majority's rule represents a workable method of interpreting the APA in harmony with the underlying organic statutes, and its holding does not give state agencies adequate notice of what is required of them to carry out their work to protect the public.

## III. Conclusion

At bottom, the majority's opinion fails to model a workable method of interpreting complicated and important administrative law issues. It does not adequately guide state agencies to know what is required of them. It also casts uncertainty over existing public health regulatory regimes. I think it our Court's job to read the APA in harmony with the substantive organic statutes that endeavor to protect public health, water, and the environment to give effect to the legislature's policy choices. I would hold that the challenged permit conditions do not require notice-and-comment rulemaking and reverse the Court of Appeals' judgment accordingly. I would remand for the court to consider the second issue raised below, whether the Division failed to adequately seek public input on the draft general permit at issue here.

Justice RIGGS joins in this dissenting opinion.